# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTHONY WRIGHT,

        Plaintiff,

    v.

CITY OF PHILADELPHIA, and Officers
THOMAS AUGUSTINE, DAVID BAKER,
THOMAS BURKE, MARTIN DEVLIN,
DENNIS DUSAK, FRANK
JASTRZEMBSKI, JAMES MORTON,
CHARLES MYERS, MANUEL SANTIAGO,
ANTHONY TOMAINO, and EUGENE
WYATT in their individual capacities,

        Defendants.

Case Number:

**COMPLAINT &
JURY DEMAND**

Plaintiff Anthony Wright, by and through his attorneys, the law firms of Neufeld, Scheck & Brustin, LLP, and Kairys, Rudovsky, Messing & Feinberg, LLP, hereby alleges as follows:

## INTRODUCTION

1.      Before being exonerated by DNA evidence, Anthony Wright came within a few juror votes of being executed for the October 18, 1991 rape and murder of seventy-seven year old Louise Talley in her home in North Philadelphia.

2.      Mr. Wright ultimately spent 25 years wrongfully incarcerated for these crimes before DNA testing *conclusively excluded* Mr. Wright as the source of the semen left by Mrs. Talley's rapist and murderer, and *conclusively matched* Ronnie Byrd, a local crack-cocaine addict with a violent criminal history who squatted in an abandoned building less than a hundred yards from Mrs. Talley's home.

3.      This miscarriage of justice was the direct result of egregious misconduct by the defendant

1

officers of the Philadelphia Police Department ("PPD"). In particular, in order to make their case against Mr. Wright, Defendants interrogated Mr. Wright for hours, attempting to obtain a confession. When their efforts failed, Defendants threatened Mr. Wright's life and presented him with a handwritten statement that did not contain any statements made by Mr. Wright, but was a narrative account of how Defendants believed the crime occurred. Under threats of extreme violence, Defendants forced Mr. Wright to sign their statement.

4.      Defendants subsequently misrepresented that within minutes of beginning to question Mr. Wright about the rape and murder, he provided them with a detailed, voluntary, and complete confession. Defendants falsely reported that the statement was a verbatim transcript of Mr. Wright's confession, which Mr. Wright read and signed without any threats or promises.

5.      To seal Mr. Wright's fate, Defendants also later falsely reported that they recovered the same clothing described in their handcrafted confession from Mr. Wright's bedroom—a Chicago Bulls shirt, jeans, and Fila sneakers. But this too was a lie; the clothing did not belong to Mr. Wright, and Defendants did not recover the clothing from Mr. Wright's bedroom.

6.      What Defendants did not realize, in 1991, was that the development of a convicted offender DNA database would eventually prove that Ronnie Byrd—a man with no connection to Mr. Wright—was the rapist and killer. Defendants also did not expect that refinements in DNA testing would prove their misconduct with the clothing: scientific testing proved that the clothes police claimed Mr. Wright confessed to wearing during the crime (and that Defendants supposedly recovered from his bedroom) were actually worn by Mrs. Talley, not by Mr. Wright. This new evidence strongly supported the conclusion that Defendants collected the clothes from Mrs. Talley's house and falsely claimed they were recovered from Mr. Wright's bedroom.

7.      Defendants, however, concealed their misconduct, including that they fabricated and

2

coerced additional witness statements that were consistent with their theory of the crime, thereby

causing Mr. Wright to spend the next 25 years wrongfully incarcerated for a rape and murder he

had nothing to do with.

8.      Further, as detailed below, Mr. Wright's wrongful conviction was the direct result of the

unconstitutional and otherwise improper policies, practices, and customs of the PPD, including

the Homicide Unit, which, for a period starting as early as the 1970's and continuing through the

investigation in this case and for years thereafter, evidences deliberate indifference by the

Defendant City of Philadelphia to practices of coerced confessions, fabrication of evidence,

witness intimidation and coercion, suppression exculpatory evidence, and abuse of authority.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color

of law of Plaintiff's rights as secured by the United States Constitution. This Court has federal

question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28

U.S.C. §1367(a).

11.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that

this is the District in which the claims arose.

## JURY DEMAND

12.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint,

pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil

Procedure 38(b).

## PARTIES

13.     Plaintiff **ANTHONY WRIGHT** is, and at all times relevant to this Complaint was, a resident of the State of Pennsylvania. Mr. Wright was born in Philadelphia in 1971. In June 1993, Mr. Wright was wrongfully convicted of the rape and murder of Mrs. Louise Talley and, as a result, served over 25 years in jail and prison until DNA evidence provided a basis for his exoneration. Mr. Wright was finally released in August 2016, after he was acquitted of all charges at a retrial.

14.     Defendant **CITY OF PHILADELPHIA** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania. The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices, and customs of the PPD, and was the employer of the individual PPD Defendants in this matter

15.     Defendant **THOMAS AUGUSTINE**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Augustine was assigned as a detective with the Homicide Unit at the time of this investigation.

16.     Defendant **DAVID BAKER**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Baker was assigned as a detective with the Homicide Unit at the time of this investigation.

17.     Defendant **THOMAS BURKE**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the

4

statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crime in this case, Defendant Burke was a sergeant assigned to the PPD's Homicide Unit.

18.     Defendant **MARTIN DEVLIN**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crime in this case, Defendant Devlin was a detective assigned to the PPD's Homicide Unit.

19.     Defendant **DENNIS DUSAK**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crime in this case, Defendant Dusak was a detective assigned to the PPD's Homicide Unit.

20.     Defendant **FRANK JASTRZEMBSKI**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crimes in this case, Defendant Jastrzembski was a detective assigned to the PPD's Homicide Unit.

21.     Defendant **JAMES MORTON**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Morton was assigned as a detective with the Homicide Unit at the time of this investigation.

22.     Defendant **CHARLES MYERS**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crimes in this case, Defendant Myers was assigned to the Northwest Detectives.

23.     Defendant **MANUEL SANTIAGO**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crimes in this case, Defendant Santiago was a detective assigned to the Homicide Unit.

24.     Defendant **ANTHONY TOMAINO**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crimes in this case, Tomaino was assigned as a detective with the Homicide Unit.

25.     Defendant **EUGENE WYATT**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crimes in this case, Wyatt was assigned as a detective with the Homicide Unit.

26.     At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Wright of his constitutionally protected rights.

## FACTUAL ALLEGATIONS

**77 year-old Mrs. Louise Talley is raped and murdered by Ronnie Byrd.**

27.     Mrs. Louise Talley was a 77 year-old widow who lived alone in her home at 3959 Nice Street in North Philadelphia. She was a well known presence in the neighborhood. She was not in a romantic relationship at the time of her death.

28.     Ronnie Byrd was a 39 year-old habitual crack-cocaine user with a long criminal record including thefts and acts of violence. He squatted in an abandoned house, just yards from the back of Mrs. Talley's property.

29.     Late in the evening of Friday, October 18, 1991, Ronnie Byrd physically and sexually assaulted Mrs. Talley in her home. Byrd entered Mrs. Talley's home; obtained a knife from the kitchen; took Mrs. Talley to an upstairs bedroom, where he vaginally raped and anally sodomized her; stabbed her repeatedly; and delivered a crushing blow to her face with the hard heel of his shoe.

30.     Byrd stole various items from Mrs. Talley's home, including two televisions, and took some of these items to a location just a few houses down the same street, where two of his friends, **Roland St. James** and **John "Buddy" Richardson**, were living.

31.     Byrd, St. James, and Richardson were friends and were regularly seen walking and talking together in the neighborhood. Bryd and St. James were known to be associates by members of the community.

32.     At the time, St. James was approximately 44 years old, 6'3", and had noticeable lumps on his face. St. James operated a crack house just a few houses down the street from Mrs. Talley's home. St. James also provided rooms for prostitution and procured drugs for some of his customers.

**33.**     Richardson, in his mid-30s, was also a heavy drug user. He lived with St. James in St. James's crack house, was involved in its operation, and was compensated by St. James for his efforts.

**34.**     Mr. Wright, who had just turned 20, was half Bryd's age, and did not know and had no connection to Byrd.

**35.**     Mr. Wright had never been inside Mrs. Talley's home, was not in the vicinity of her home on the night of the murder, and had nothing to do with Byrd's crimes.

**36.**     On the date of Mrs. Talley's rape and murder, Mr. Wright lived on Brunner Street with his mother, approximately three-quarters of a mile from Mrs. Talley's home.

**The on-scene Defendants' initial investigation of the crime scene.**

**37.**     On October 19, 1991, the day after Mrs. Talley's murder, neighbors became concerned that they had not seen Mrs. Talley for some time. At around 3:00 p.m., neighbors contacted the PPD, asking officers to check on Mrs. Talley.

**38.**     Officers from the 39th District were the first to arrive on scene, followed by detectives from the Homicide Unit.

**39.**     Defendants Dennis Dusak, Manuel Santiago, and Thomas Burke (collectively "the on-scene Defendants") responded to the scene.

**40.**     Defendant Dusak was assigned as lead detective; it was his responsibility to oversee the investigation, gather the evidence obtained by various officers and detectives, including all witness statements, and ensure that the case came together.

**41.**     Dusak's and Santiago's immediate supervisor, Sgt. Burke, served as the on-scene supervisor. It was Burke's responsibility to give direction to uniformed officers and detectives. He also reviewed all witness statements taken by detectives or officers.

8

42.     The on-scene Defendants examined the crime scene, and Defendants Santiago and Dusak took notes and later prepared detailed reports of their observations, significant parts of which would later be incorporated into Mr. Wright's fabricated confession and into the fabricated and coerced statements of other witnesses.

43.     The on-scene Defendants' initial review of the crime scene revealed the murder weapon—a 12 inch metal knife with an 8 inch blade, stained with blood—wrapped in a bathrobe next to Mrs. Talley's nude corpse.

44.     Numerous stab wounds (to both Mrs. Talley's front and back) and defensive wounds on her arms were also immediately evident, indicating a struggle had occurred.

45.     The on-scene Defendants believed that the perpetrator had stolen various items from Mrs. Talley's home, including at least one television.

46.     The on-scene Defendants also observed in Mrs. Talley's home, what they believed to be masculine-looking items of clothing—a black Chicago Bulls shirt, jeans, and Fila sneakers.

47.     As discussed in detail below, certain Defendants would later falsely report that Mr. Wright confessed to wearing these clothes while committing the crime, and other Defendants would falsely report that these clothes were found in Mr. Wright's bedroom. What none of the Defendants anticipated, however, was that DNA testing performed in 2013–14 would prove that Mrs. Talley, not Mr. Wright, had worn these clothes.

48.     Based on the extensive trauma, the blunt-force injury to Mrs. Talley's face was not evident to the on-scene Defendants. That injury was not reported to any of the Defendants until after Mr. Wright's arrest. At the autopsy, the medical examiner collected a rape kit, including swabs from Mrs. Talley's rectum and vagina.

**Despite evidence implicating St. James and Richardson in the crimes, Defendants ignore this lead and instead fabricate evidence implicating Mr. Wright.**

**49.**     Within hours of arriving at the crime scene, the on-scene Defendants learned that individuals around the neighborhood had seen St. James that morning attempting to sell Mrs. Talley's stolen television.

**50.**     An officer from the 39th District located St. James, and the on-scene Defendants soon determined that St. James and Richardson had been in possession of Mrs. Talley's television and other stolen items.

**51.**     The on-scene Defendants understood that St. James and Richardson were connected to the crimes and instructed others to place them under arrest and to take them to the Homicide Unit so that they could eventually provide formal statements.

**52.**     Later that evening, Defendant Det. James Morton would take St. James's formal statement, and Defendant Det. David Baker would take Richardson's, both of which these Defendants knew (or should have known) falsely implicated Mr. Wright.

**53.**     Upon information and belief, prior to obtaining St. James's and Richardson's formal statements, the on-scene Defendants and/or Defendants Morton and Baker discussed Defendants' theory of the crime with St. James and Richardson, providing these witnesses with relevant details to incorporate into their eventual statement.

**54.**     These Defendants later failed to report the extent of their pre-statement discussions with St. James and Richardson, including inculpatory statements, exculpatory statements regarding Mr. Wright, and the details that these Defendants provided to St. James and Richardson in order to make their eventual statement seem credible.

**55.**     Instead, the on-scene Defendants simply reported that neighborhood witnesses, including St. James and Richardson, had implicated Mr. Wright in the crimes (which the on-scene

Defendants knew or should have known was false), and Defendants Morton and Baker reported St. James's and Richardson's formal statements.

56.     Despite their inculpatory behavior and statements, St. James and Richardson were both released from police custody after making false statements implicating Mr. Wright. Neither was ever charged in connection with the homicide or for their possession of the property stolen.

57.     St. James and Richardson were brought in for a second formal statement two days later, the day *after* Mr. Wright's arrest. Defendants Anthony Tomaino and Dusak took St. James's statement, and Defendant Eugene Wyatt took Richardson's.

58.     These second formal statements deviated in material ways from St. James's and Richardson's initial statements to the on-scene Defendants and to Defendants Morton and Baker, but again implicated Mr. Wright, which all Defendants, including Tomaino, Dusak, and Wyatt, knew or should have known was false.

59.     Upon information and belief, like the on-scene Defendants and like Defendants Morton and Baker, these Defendants (Tomaino, Dusak, and Wyatt) also deliberately failed to report the full extent of their discussions with St. James and Richardson, including inculpatory statements by St. James and Richardson, exculpatory statements regarding Mr. Wright, and the details that these Defendants provided to St. James and Richardson in order to make their statement seem credible.

60.     Based on St. James's and Richardson's criminal history, drug use, and involvement in the crimes, all Defendants understood that St. James's and Richardson's statements were not sufficiently credible and were not an adequate basis to arrest or prosecute Mr. Wright.

61.     Accordingly, rather than arrest Mr. Wright, the on-scene Defendants located additional witnesses to provide inculpatory statements against Mr. Wright. In particular, the on-scene

Defendants located three 14 to 16 year-old witnesses who lived in the neighborhood and were also involved in selling drugs.

62. Without informing their parents and without having the youths' parents present, the on-scene Defendants had these witnesses brought down to the Homicide Unit, where Defendants Charles Myers and Frank Jastrzembski took their formal statements.

63. Defendant Myers obtained a false statement implicating Mr. Wright from **Gregg Alston.** Defendant Myers supplied the relevant details, wrote out the false statement in his own handwriting, and through suggestion and/or coercion obtained Mr. Alston's signature. Defendant Myers later falsely claimed that the statement from Mr. Alston was a verbatim transcript of the questions he asked Mr. Alston and the answers Mr. Alston provided.

64. Defendant Jastrzembski obtained false statements from **Shawn Nixon** and **Antonio Johnson** that mirrored the statement Myers obtained from Mr. Alston. The statements also included the false detail that the witnesses saw Mr. Wright wearing a Chicago Bulls shirt or jacket. Defendant Jastrzembski falsely claimed that the statements were verbatim transcripts of the questions he asked and the answers the witnesses provided.

65. Like Mr. Alston, Mr. Nixon and Mr. Johnson never made the statements written by Defendant Jastrzembski. Jastrzembski supplied the information, typed or wrote out the false statement himself, and through coercion and/or suggestion, obtained their signatures.

66. These three witnesses never saw Mr. Wright enter Mrs. Talley's home and never saw him wearing a Chicago Bulls shirt, but were coerced and/or suggested into making false and fabricated statements to fit Defendants' theory of the crime.

67. Decades later, during post-conviction proceedings, Mr. Alston and Mr. Nixon explained that their interrogators had coerced them. Mr. Alston, for example, was told he would never see

12

his mother again if he did not state that he saw Mr. Wright enter Mrs. Talley's home.

**Defendants pick up Mr. Wright and, after hours of unsuccessful coercive interrogation, force him to sign a made up confession supplied by Defendants.**

68.     The next day, Sunday, October 20, at approximately 1:00 p.m., Det. Santiago and Sgt. Burke arrived at Mr. Wright's home and informed him that there had been a murder in the area.

69.     Santiago and Burke asked Mr. Wright to come with them to the Homicide Unit at the Police Administration Building, telling him that they would bring him right back.

70.     At approximately 2:00 p.m., Santiago placed Mr. Wright in a small interrogation room. Although Defendants had the capability, the interrogation was not video or audio taped.

71.     Santiago and Burke, joined by Defendant Martin Devlin (collectively, "the interrogating Defendants"), in various combinations and at different times, interrogated Mr. Wright for hours.

72.     Until Mr. Wright's interrogation, Devlin had not been involved in any part of the investigation into Mrs. Talley's murder. Upon information and belief, Defendants Santiago, Burke, and/or Dusak brought (or approved of bringing) Defendant Devlin into the interrogation for the express purpose of coercing a confession, or at least coercing a signature to their made up confession, from Mr. Wright.

73.     Without informing Mr. Wright of his *Miranda* rights, the interrogating Defendants accused Mr. Wright of murdering Mrs. Talley and falsely claimed that police had eyewitness and physical evidence against him. Mr. Wright was not told he was free to leave, was not asked if he wanted to contact a lawyer, and was denied the opportunity to call his mother, despite repeated requests.

74.     For hours, Mr. Wright repeatedly denied any involvement in the crimes and provided the interrogating Defendants with details about his whereabouts for the previous days.

13

75.     After hours of unsuccessful interrogation, the interrogating Defendants handcuffed Mr. Wright to the chair and presented him with a nine-page statement handwritten by Defendant Devlin. This handwritten statement was in question-and-answer format, but Mr. Wright had never made any of the inculpatory statements. Rather than containing Mr. Wright's words, the statement was a narrative of how Defendants believed the crime had occurred. All of the details were included by the interrogating Defendants in order to fit Defendants' theory of the crime.

76.     The interrogating Defendants demanded that Mr. Wright sign the statement. When Mr. Wright refused, one of the interrogating Defendants ripped off his hat, screamed, and threatened him with extreme violence: he threatened to "rip [Mr. Wright's] eyes out" and "skull-f**k" him if he did not confess to the rape and murder and sign the statement.

77.     Another of the interrogating Defendants pressed on the back of Mr. Wright's neck, causing Mr. Wright to fear that he would be choked.

78.     The interrogating Defendants also falsely promised Mr. Wright that if he signed the statement, he would be permitted to go home.

79.     The fabricated handwritten statement included details that the Defendants believed to be true from their initial review of the crimes scene—that there was no forced entry, details about Mrs. Talley's home, that there was a struggle (as indicated by the defense wounds), that she was stabbed, and that she was sexually assaulted (as indicated by her naked body) and killed.

80.     The fabricated handwritten statement also falsely stated that Mr. Wright wore a black Chicago Bulls shirt, blue jeans with suede material, and black Fila sneakers during the crime, and that those clothes were currently in his bedroom—details that the on-scene Defendants and the interrogating Defendants knew were not true.

81.     Under threats of violence and pressure from the interrogating Defendants, Mr. Wright

14

eventually relented and signed and initialed the statement as directed, without being permitted to read what he was signing.

82.     The interrogating Defendants even forced Mr. Wright to sign a *Miranda* waiver form, even though he had never been provided *Miranda* rights.

83.     The interrogating Defendants deliberately failed to document Mr. Wright's protestations of innocence and the details of his actual statements. Instead, these Defendants later falsely reported that Mr. Wright waived his *Miranda* rights; within minutes provided a detailed, voluntary, and complete confession; and that Defendant Devlin hand-wrote a word-for-word transcript of the confession, which Mr. Wright read and signed.

**Defendants search Mr. Wright's home, and falsely claim that they find the Chicago Bulls clothing from his bedroom.**

84.     At approximately 8:30 p.m., Defendant Jastrzembski, after speaking with Defendants Santiago, Devlin, Dusak, and/or Burke about Mr. Wright's interrogation and fabricated confession, obtained a search warrant that permitted a nighttime search of Mr. Wright's bedroom.

85.     At approximately 9:45 p.m., about 8 hours after Mr. Wright's interrogation began, Defendants Jastrzembski, Tomaino, and Thomas Augustine (collectively, "the search Defendants") conducted a search of Mr. Wright's bedroom, during which they claimed to recover the three items of clothing described by the witnesses and described in Mr. Wright's fabricated confession—a black Chicago Bulls shirt, a pair of blue jeans with black suede patches, and black Fila sneakers.

86.     In their subsequent reports, the search Defendants claimed that they located the clothing in Mr. Wright's bedroom. In reality, however, the on-scene Defendants who responded to the

crime scene found this clothing in Mrs. Talley's home. Defendants Jastrzembski, Tomaino, and Augustine knew that the clothing was not recovered from Mr. Wright's bedroom or anywhere else in his mother's home, but deliberately misrepresented this fact in their official reports and to prosecutors.

87.     Forensic tests conducted on the clothing prior to Mr. Wright's 1993 trial showed that the clothing had a few drops/smears of blood on it (one minute drop/smear on the jeans, and two on the shirt). Those few drops/smears were consistent with Mrs. Talley's blood type, but not with Mr. Wright's.

88.     Given the enormous amount of blood at the crime scene and given the nature of the 10 stab wounds (3 of which were to major arteries), the minute amount of blood on the clothing was inconsistent with the clothing having been worn by the perpetrator. The blood found was, however, consistent with the on-scene Defendants or the search Defendants having deliberately planted a small amount of Mrs. Talley's blood from the crime scene onto the clothing.

89.     Mr. Wright's mother observed the search Defendants seize only two items from the home: a white jumpsuit (which Mr. Wright wore for his construction job) and some framed photographs of Mr. Wright and his family.

**Based on fabricated and coerced evidence, Mr. Wright is wrongfully convicted.**

90.     All Defendants provided prosecutors from the Philadelphia District Attorney's Office with false, misleading, and incomplete information regarding their investigation in this case in an effort to obtain the District Attorney's Office's approval for Mr. Wright's arrest and prosecution.

91.     Because the Philadelphia District Attorney's Office did not know that Defendants had fabricated Mr. Wright's confession, had misrepresented that they recovered the clothing from Mr. Wright bedroom, and had fabricated and coerced other witness statements, prosecutors

charged Mr. Wright with Mrs. Talley's rape and murder.

92.     At trial, the prosecution argued that Mr. Wright, acting alone, entered Mrs. Talley's

home, raped and sodomized her, stabbed her to death, and later returned to steal her property,

some of which he later deposited at St. James's crack house.

93.     Mr. Wright testified in his own defense, maintaining his innocence and adamantly

denying any role in Mrs. Talley's rape-murder. He insisted that he signed the narrative statement

written out by the interrogating Defendants only because they threatened him with bodily harm

and promised he would be freed. He also denied having ever seen, possessed, or worn the

clothing that the search Defendants claimed they recovered from his bedroom.

94.     On June 8, 1993, a Philadelphia County jury convicted Mr. Wright of first-degree

murder, rape, burglary, robbery, and possession of an instrument of crime.

95.     The prosecution sought the death penalty. The jury, however, divided 7 to 5 on penalty,

and Mr. Wright was automatically sentenced to life without the possibility of parole.

96.     Mr. Wright appealed his conviction and sentence, and on August 14, 1995, the Superior

Court affirmed. *See Commonwealth v. Wright*, 668 A.2d 1200 (Pa. Super 1995).

97.     On August 13, 1996, Mr. Wright filed a *pro se* Post Conviction Relief Act (PCRA)

petition that did not raise DNA issues. The PCRA court dismissed the petition.

**DNA testing establishes Mr. Wright's innocence and Defendants' misconduct.**

98.     On July 16, 2005, Mr. Wright filed a motion for post-conviction DNA testing. The

Commonwealth opposed Mr. Wright's request, and the Court denied any testing.

99.     Mr. Wright appealed this denial and eventually, in 2011, the Pennsylvania Supreme

Court reversed and remanded. *See Commonwealth v. Wright*, 609 Pa. 22 (2011).

100.    In 2013, DNA testing and subsequent investigation revealed that the medical examiner

had incorrectly concluded that the rape kit swabs collected from Mrs. Talley in 1991 were "negative" for semen and sperm; the testing demonstrated that the vaginal swabs contained abundant spermatozoa from a single, male donor.  In 2014, the rectal swabs were tested and were also found to contain abundant spermatozoa from the same male donor.

101.    Testing conclusively demonstrated that Mr. Wright was not the source of any of the spermatozoa or DNA found on the vaginal and rectal swabs.

102.    In 2013, the single, male DNA profile obtained from the vaginal swabs was *conclusively matched* to Ronnie Byrd using the FBI's National DNA Index System, which included DNA profiles of convicted felons.

103.    In order to confirm the accuracy of the match, the DNA laboratory was given another sample of Byrd's biology. He was again identified as the source. Rectal swab testing also matched Byrd and excluded Mr. Wright.

104.    Following Mrs. Talley's rape and murder, Ronnie Byrd committed a number of additional crimes over the course of two decades. He eventually ended up incarcerated in South Carolina, where he died in a hospital in March 2013—several years after Mr. Wright first sought DNA testing, and just days after being identified through the FBI DNA databank ("CODIS") as Mrs. Talley's rapist, sodomizer, and killer.

105.    St. James and Richardson also died while Mr. Wright was incarcerated.

106.    An independent laboratory jointly approved by the defense, the prosecution, and the Court conducted DNA testing on the *interior* of the clothing that Defendants claimed they had found in Mr. Wright's bedroom—the Chicago Bulls shirt, the jeans, and the Fila sneakers.  At the time the testing was performed, the forensic DNA community had developed advanced methodology for testing interior areas of a garment or shoes, and such methods had become

widely accepted as a means to identify the wearer's DNA; at the time of Mr. Wright's initial arrest and prosecution, this advanced testing was not known, much less available.

107.     That independent DNA testing identified Mrs. Talley as the wearer of the clothing, and excluded Mr. Wright as the wearer. This conclusion was subsequently confirmed by additional expert analyses conducted by the PPD's own Office of Forensic Science.

108.     The PPD's Office of Forensic Science conducted additional testing, which confirmed that the DNA found throughout the interior of the clothing, was not from Mrs. Talley's blood, but from her skin and sweat cells, confirming that she was in fact the wearer of the clothing.

109.     With this new evidence of innocence (and of Defendants' misconduct), Mr. Wright filed a PCRA petition based on the results of the DNA testing.

110.     The District Attorney's Office ultimately agreed to Mr. Wright's request to vacate his conviction, but decided to retry Mr. Wright for Mrs. Talley's rape and murder.

111.     The District Attorney's Office based its decision to retry Mr. Wright on the same fabricated and coerced evidence presented to them by Defendants, who continued to maintain that they did not fabricate or coerce any witness statements, that Mr. Wright voluntarily confessed, and that they found the clothing in Mr. Wright's bedroom.

112.     Based on this false information provided by Defendants, Mr. Wright was brought to trial for a second time, beginning on August 8, 2016. At the retrial, Defendants reiterated the fabrications they had first developed prior to Mr. Wright's arrest and false confession.

113.     On August 23, 2016, after less than an hour of deliberation, the jury acquitted Mr. Wright of all charges. He walked out of prison a free man for the first time in nearly 25 years. Following the verdict, the jury foreperson explained: "The evidence of his innocence was so overwhelming that there could've been no other verdict."

**The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and suggestion of false statements from witnesses and suspects, and suppression of exculpatory evidence**

114.    For many years dating back at least to the 1970's, and continuing well beyond the time of the investigation of Mrs. Talley's murder, the City of Philadelphia, had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain confessions; fabricating inculpatory evidence; withholding exculpatory evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees by feeding details about the crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees.

115.    This policy, practice, or custom involved the use of various techniques to coerce inculpatory statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from their friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people—that the suspect will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

116.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation;

selectively documenting a witness or suspect's eventual statement and not the preceding

interrogation, preparation, and rehearsal; and misrepresenting that a suspect's formal statement

was a verbatim statement in the suspect's own words.

117.    These practices were well known to the City of Philadelphia and its policymakers with

respect to criminal investigations and prosecutions as a result of newspaper investigations

including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977–1978,

governmental investigations, complaints from lawyers and civilians, and internal police

investigations.

118.    Various cases demonstrate that this misconduct was pervasive within the Philadelphia

Police Department at time of Mr. Wright's interrogation, and, upon information and belief, the

misconduct described below was committed with the knowledge of in full view of Homicide and

PPD supervisors or because of their deliberate indifference to this misconduct.

119.    **Carlos Hernandez** (CP-51-CR-0302131-1991) & **Ed Williams**. A woman and her

boyfriend were robbed at gunpoint by two men and her boyfriend was shot. **Detective Devlin**

interrogated a key witness, Juan Sanchez, and extracted a statement from him implicating Carlos

Hernandez and another man. Mr. Sanchez described the circumstances of his statement as

follows: Det. Devlin held him in custody and interrogated him for three days, without food or

water; he was denied use of the bathroom and had to urinate on the floor; Det. Devlin hit him

several times. After coercing Mr. Sanchez's statement, Det. Devlin interrogated Mr. Hernandez

and obtained a statement from him implicating Ed Williams. Mr. Hernandez described the

circumstances of his statement as follows: Det. Devlin had him handcuffed to a chair and held

him without water, food, or use of a bathroom; Det. Devlin punched him in the face and pressed

his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was

proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

120.   **Jackie Combs Jr.** PPD detectives, including **Det. Devlin,** coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives.

121.   **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder that occurred in South Philadelphia while he was working at a popular and busy restaurant. Mr. Veasy was interrogated by Detective Devlin until he provided a "confession." Mr. Veasy has described that Det. Devlin isolated him in an interrogation room where Det. Devlin smacked him around and kicked his testicles several times until Mr. Veasy agreed to sign the "confession."

122.   **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, **Detective Santiago** obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, Det. Santiago coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by Det. Santiago. After David Glenn testified regarding Det. Santiago's misconduct and disavowed the statement Santiago had coerced him to sign, Santiago notified the Court and the Commonwealth of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case.  Shortly after receiving this letter from Santiago's counsel, the prosecution dismissed all charges against St. George, but Det. Santiago remained with the PPD through September 1996.

123.   **Jimmy Dennis.** On October 22, 1991, just days after Mrs. Talley was killed, Chedell

Williams was killed in North Philadelphia. **Det. Jastrzembski** led a team of detectives, including

**Det. Santiago**, who pursued the investigation. Dennis was arrested on November 22, 1991. In

2016, the U.S. Court of Appeals, sitting *en banc*, affirmed the District Court's decision

overturning Dennis's conviction and granting federal habeas relief based on multiple *Brady*

violations. District Judge Anita Brody ruled that the PPD "covered up evidence" that "pointed

away" from Dennis' guilt, suppressed key witness statements, and staged sham suspect lineups.

In a situation that was strikingly similar to this case, the District Court noted that although

Jastrzembski had never itemized or photographed clothing taken from Dennis's home, before

being lost mysteriously before trial, Jastrzembski nevertheless took the stand and claimed that

the clothes matched the kind worn by Dennis the day he shot the girl.

124.   **Donald Ray Adams (CP 51-CR-0743812-1991).** Mr. Adams was charged and convicted

in the 1990 murders of Darryl Patterson and Thomas Winn. The initial investigation of the case

did not produce a suspect and in June, 1991 PPD Detectives David Clark and Igor Alfimow were

assigned to re-investigate the matter. These detectives secured a statement from an alleged

witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr.

Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms.

Benjamin was coerced and false and some years later she recanted. In 2007, the Court of

Common Pleas granted post-conviction relief based on the testimony of Ms. Benjamin that the

detectives threatened her with incarceration, promised that her open criminal charges would be

dismissed, and offered her financial and other material support for her testimony. The detectives

ignored the fact that other witnesses provided physical descriptions of the assailant as over six

feet tall, thin, light skinned and in his 20's. Mr. Adams was 5'4", 200 pounds, dark skinned and

in his 30's. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a retrial, Mr. Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Mr. Adams received compensation for his wrongful conviction.

125.    **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley—an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. **Det. Santiago** soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, all seven photos that Det. Santiago showed Presley were of Swainson. Presley explained that he only testified against Presley because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by counsel from Morgan Lewis.

126.    **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to **Det. Devlin**. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. According to Det. Devlin, about an hour into the interrogation, Ogrod

24

supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him—eventually signing the statement written out in longhand by Det. Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan Lewis and the Federal Community Defender Capital Habeas Unit.

127.    At the time of the investigation and prosecution of this case, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses in criminal investigations, without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

128.    This practice, as exemplified by the investigations in Mr. Wright's case and those detailed in paragraphs 119–126, *supra*, continued for years due to the deliberate indifference of the Police Department and City of Philadelphia to this policy, practice, and custom. Finally, in 2014, after further proof of this policy, practice, and custom was provided to the Police Department, the District Attorney, and the City of Philadelphia, the Police Department issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interviews of witnesses and the detention and interrogation of suspects by police detectives.

129.    During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of

violating the constitutional rights of criminal suspects and others, including systemic violations

of the Fourth and Fourteenth Amendments. On three separate occasions in the 1980's courts in

the Eastern District of Pennsylvania issued orders enjoining the Police Department from

engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985)

(consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and

detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City*

*of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring

Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264

(E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during

investigation of the "Center City Stalker").

**130.**    Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the 39th

Police District in Philadelphia (the same district where the Talley rape and murder occurred)

engaged in widespread unconstitutional practices, including fabrication of search and arrest

warrants and other false allegations of criminal conduct, planting of evidence on suspects,

coercive and physically abusive interrogations, and theft of money and drugs. This squad, led by

Officer John Baird, engaged in these practices for years and violated the rights of thousands of

persons, due to the deliberate indifference of the Philadelphia Police Department, including the

disregard of credible complaints to IAD and District Attorney, deliberately biased internal

investigations, and a practice and custom of exonerating police officers regardless of the

evidence of misconduct. This systemic and unconstitutional practice and custom was ended only

upon investigation by the FBI and prosecution of the officers by the United States. As a result of

this pattern of police misconduct that was in effect at the time of the investigation of the

homicide for which plaintiff Wright was charged, a Court in the Eastern District entered a

Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the Philadelphia Police Department. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

131.    In summary, at the time of the investigation and prosecution of Anthony Wright, the PPD had a practice, policy, and custom of:

      **a.**  Engaging in unlawful interrogation of suspects, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, and failing to disclose exculpatory evidence;

      **b.**  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

      **c.**  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

      **d.**  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants; including unlawful police interrogations, searches, and arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

      **e.**  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Wright.

132.    At the time of the investigation and prosecution of Anthony Wright, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to

the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

 **a.** excessive and chronic delays in resolving disciplinary complaints;

 **b.** a lack of consistent, rational and meaningful disciplinary and remedial actions;

 **c.** a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

 **d.** the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

 **e.** the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

 **f.** the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

 **g.** a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

 **h.** serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

 **i.** lack of an effective early warning system to identify, track, and monitor "problem" officers;

 **j.** IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below

acceptable standards of police practice and failed to address key issues; and

k. IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## DAMAGES

133.   The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Wright to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over 25 years in prison for a brutal crime he did not commit.

134.   As a direct result of Defendants' conduct and omissions, Mr. Wright sustained injuries and damages, including loss of his freedom for more than twenty-five years, loss of his youth, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

135.   As a direct result of Defendants' conduct and omissions, Mr. Wright was deprived of his familial relationships, including with son, who was four years old when Mr. Wright was arrested, and with his mother, who died while Mr. Wright was incarcerated.

136.   As a direct result of Defendants' conduct and omissions, Mr. Wright sustained economic injuries and damages, including loss of income and loss of career opportunities.

137.   As a direct result of Defendants' conduct and omissions, Mr. Wright sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness,

inadequate medical care.

**138.** As a direct result of Defendant's conduct and omissions, Mr. Wright was forced to suffer the emotional pain and suffering of a second criminal trial, even after exculpatory DNA results proved that Ronnie Byrd had committed the crimes and that Mr. Wright was factually innocent.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

*Against all Individual Defendants*

**139.** Plaintiff incorporates by reference all of the foregoing paragraphs.

**140.** The individual Defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Wright for Mrs. Talley's rape and murder, intentionally caused Mr. Wright to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Wright's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

**141.** The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

**142.** The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Wright's clearly established constitutional rights. No reasonable officer in 1991 would have believed this conduct was lawful.

**143.** The prosecution finally terminated in Mr. Wright's favor on August 23, 2016, when a criminal jury acquitted him of all charges.

30

144.    The acts and omissions by the individual Defendants described in the preceding

paragraphs were the direct and proximate cause of Mr. Wright's injuries because these

Defendants knew, or should have known, that their conduct would result in the wrongful arrest,

prosecution, conviction, and incarceration of Mr. Wright.

**COUNT II: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**

*Against All Individual Defendants*

145.    Plaintiff incorporates by reference all of the foregoing paragraphs.

146.    The individual Defendants, acting individually and in concert, and within the scope of

their employment with the PPD, deprived Mr. Wright of his clearly established constitutional

right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately

using coercion and/or suggestion to obtain inculpatory witness statements, including without

limitation: the false statements of St. James, Richardson, Alston, Nixon, and Johnson; Mr.

Wright's fabricated confession; and that the "planting" of the clothing in Wright's bedroom.

147.    The individual Defendants deprived Mr. Wright of his right to a fair trial by withholding

material exculpatory and impeachment evidence from prosecutors and defense, including

without limitation, information regarding the true circumstances of St. James's, Richardson's,

Johnson's, Nixon's, and Alston's interrogation and their actual statements prior to Defendants'

coercion and fabrication of their false statements—that these witnesses knew nothing about the

murders and had no information implicating Mr. Wright. Defendants also withheld information

regarding the circumstances of Mr. Wright's interrogation and information regarding the true

location where Defendants recovered the clothing (which they later falsely reported was fond in

Mr. Wright's bedroom).

148.    The individual Defendants deprived Mr. Wright of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to pursue information from St. James and Richardson which would have led to the true killer and rapist, Ronnie Byrd.

149.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Wright's clearly established constitutional rights. No reasonable officer in 1991 would have believed this conduct was lawful.

150.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wright's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Wright's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT III: 42 U.S.C. § 1983 claim for violation of Plaintiff's right against self-incrimination in violation of the Fifth and Fourteenth Amendments

*Against Defendants Santiago, Devlin, and Burke*

151.    Plaintiff incorporates by reference all of the foregoing paragraphs.

152.    Although Mr. Wright never actually confessed to Mrs. Talley's rape and murder, Defendants Santiago, Devlin, and Burke coerced Mr. Wright into signing and initialing a made up statement handwritten by the detectives, which Defendants later misrepresented as a voluntary confession.

153.    The circumstances of Mr. Wright's interrogation were highly coercive, including but not limited to the fact that the defendants isolated Mr. Wright, failed to inform him of his *Miranda* rights, ignored his requests to call his mother, interrogated him for hours, verbally abused him,

and threatened him with great physical violence.

**154.** Ultimately, Mr. Wright's coerced statement was used against him at the grand jury stage and at both of his trials, thereby violating Mr. Wright's right against self-incrimination.

**155.** As a direct and proximate result of Defendants' actions, Mr. Wright was wrongly prosecuted, detained, and incarcerated for nearly 25 years and suffered the other injuries and damages set forth above.

### COUNT IV: 42 U.S.C. § 1983 Civil Rights Conspiracy

*Against All Individual Defendants*

**156.** Plaintiff incorporates by reference all of the foregoing paragraphs.

**157.** The individual Defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, including St. James and Richardson, to act in concert in order to deprive Mr. Wright of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

**158.** In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

　　**a.** Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

　　**b.** Coercing and fabricating Mr. Wright's false confession;

　　**c.** Misrepresenting that they had recovered the Chicago Bulls shirt and other clothing from Mr. Wright's bedroom;

　　**d.** Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

    **e.**   Wrongfully prosecuting Mr. Wright while knowing that they lacked probable cause; and

    **f.**   Committing perjury during hearings and trials.

**159.**   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wright's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Wright's wrongful arrest, prosecution, conviction, and incarceration.

### COUNT V: 42 U.S.C. § 1983 Failure to Intervene

*Against All Individual Defendants*

**160.**   Plaintiff incorporates by reference all of the foregoing paragraphs.

**161.**   By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment with the PPD, had opportunities to intervene on behalf of Mr. Wright to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

**162.**   These Defendants' failures to intervene violated Mr. Wright's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1991 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Wright to be arrested and prosecuted without probable cause, were lawful.

**163.**   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wright's injuries. Defendants knew, or should have known, that their

34

conduct would result in Mr. Wright's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VI: 42 U.S.C. § 1983 Supervisory Liability Claim

### *Against Defendant Burke*

164.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

165.    Defendants, including detectives Santiago, Devlin, and Jastrzembski, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Burke, both in this case and as a matter of practice and custom

166.    Defendant Burke acted recklessly and with deliberate indifference to Mr. Wright's constitutional rights by failing to adequately train, supervise, and discipline the PPD Homicide detectives assigned to this investigation, including detectives Santiago, Devlin, and Jastrzembski, thereby allowing and causing these detectives to deprive Mr. Wright of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

167.    Defendant Burke was both personally involved in the investigation of Mr. Wright, and directly supervised the investigative acts taken by the Homicide detectives, including Santiago, Delvin, and Jastrzembski.

168.    The reckless and deliberately indifferent conduct of Defendant Burke violated his clearly established duty, in 1991, to supervise the defendant detectives, and no reasonable police supervisor in 1991 would have believed that reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

169.    Defendant Burke's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wright's injuries. Defendant Burke knew, or should have

known, that his conduct would result in Mr. Wright's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VII: 42 U.S.C. § 1983 Municipal Liability Claim

### Against Defendant City of Philadelphia

170.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

171.     The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Mr. Wright's wrongful arrest and conviction, and for many years preceding and following this investigation a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

172.     Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

173.     Such unconstitutional municipal customs, practices and/or policies were the moving force behind Mr. Wright's false, coerced, and fabricated confession, causing his arrest, prosecution, and almost twenty-five years of incarceration, as well as all the other injuries and damages set forth above.

### COUNT VIII: Malicious Prosecution under Pennsylvania state law

*Against All Individual Defendants*

174.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

175.   The individual Defendants initiated or continued proceedings against Mr. Wright, without

probable cause, with malice or specific intent to injure, and the proceedings ultimately

terminated in Mr. Wright's favor on August 23, 2016, when he was acquitted him of all charges.

176.   As a result of this malicious prosecution, Mr. Wright sustained the injuries and damages

set forth above.


**WHEREFORE**, Plaintiff Anthony Wright prays as follows:

   A.  That the Court award compensatory damages to Plaintiff and against all Defendants,
       jointly and severally, in an amount to be determined at trial;
   B.  That the Court award punitive damages to Plaintiff, and against all individual Defendants
       in their individual capacity, in an amount to be determined at trial, that will deter such
       conduct by defendants in the future;
   C.  For a trial by jury;
   D.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including
       reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983
       claims; and
   E.  For any and all other relief to which Plaintiff may be entitled.

David Rudovsky
Pa. ID No. 15168
Jonathan Feinberg
Paul Messing
Susan Lin
Kairys, Rudovsky, Messing & Feinberg, LLP
The Cast Iron Building

37

718 Arch Street, Suite 501 South
Philadelphia, PA 19106

Peter Neufeld*
Nick Brustin*
Farhang Heydari*
Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081
*Attorneys not yet admitted to the Eastern
District of Pennsylvania; applications to
practice pro hac vice forthcoming

38