**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **ANTHONY WRIGHT,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| v. | : | |
| | : | **No.  16-5020** |
| **CITY OF PHILADELPHIA et al.,** | : | |
| *Defendants.* | : | |

PRATTER, J.                                                           JANUARY 17, 2017

**MEMORANDUM**

**I.      INTRODUCTION**

Anthony Wright sued the City of Philadelphia and 11 individuals, all of whom were members of the Philadelphia Police Department during the time relevant to this action, pursuant to 42 U.S.C. § 1983 and Pennsylvania state law.  This action arises out of the investigation and prosecution that resulted in Mr. Wright's wrongful conviction for a 1991 rape and murder. Mr. Wright alleges that the Defendants, working individually and in concert, fabricated evidence, coerced a false confession, and withheld exculpatory evidence, among other alleged misconduct, all of which led to Mr. Wright's arrest, prosecution, and conviction for a crime he did not commit.  After DNA evidence conclusively excluded Mr. Wright as the source of the biological evidence found at the crime scene, Mr. Wright's conviction was vacated.  Upon retrial, a jury acquitted Mr. Wright of all charges.  Mr. Wright spent 25 years in prison as a result of his wrongful conviction.

Mr. Wright now brings an eight-count complaint against Defendants for (i) malicious prosecution pursuant to § 1983 (Count 1) and Pennsylvania law (Count 8); (ii) due process violations (Count 2); (iii) violating his right against self-incrimination (Count 3); (iv) civil rights

conspiracy (Count 4); (v) failure to intervene (Count 5); (vi) supervisory liability (Count 6); and (vii) municipal liability (Count 7).  Defendants have moved to dismiss (i) Counts 2-4 on statute of limitations grounds; (ii) Count 7 for failure to sufficiently plead a *Monell* claim; and (iii) all claims against Detectives David Baker, Dennis Dusak, and Eugene Wyatt for failure to state a claim.  Because the Court concludes that Mr. Wright's claims did not accrue until after the criminal proceedings against him were favorably terminated, and because Mr. Wright has stated plausible claims for relief against the City and Detectives Baker, Dusak, and Wyatt, the Court will deny the motion in its entirety.

## II.   ALLEGATIONS IN THE COMPLAINT[1]

On October 18, 1991, 77 year-old Louise Talley was raped and murdered in her North Philadelphia home.  While DNA evidence would eventually exonerate Mr. Wright, and conclusively implicate an individual named Ronnie Byrd, Mr. Wright was wrongfully convicted of Ms. Talley's rape and murder and served 25 years in prison.

Officers Dennis Dusak, Manuel Santiago, and Thomas Burke (the "on-scene Defendants") were the first officers to arrive at the crime scene.  Detective Dusak, as the lead detective, was responsible for overseeing the investigation of Ms. Talley's rape and murder.  The on-scene Defendants' initial review of the crime scene revealed (i) that Ms. Talley was stabbed to death with a 12-inch metal knife with an eight-inch blade; (ii) evidence that suggested the crime's perpetrator stole a TV; and (iii) the presence of masculine clothing items, including a

---

[1]     The facts described herein are taken from Mr. Wright's Complaint and contain all reasonable inferences that may be drawn from the Complaint.  At this initial pleading stage, Mr. Wright has not always delineated with specificity whether acts alleged are ascribed to all defendants named in a given paragraph, or to a smaller subset of listed defendants.  *See e.g.*, Compl. ¶ 53 (Doc. No. 1) (using the conjunction "and/or").  Therefore, for the purposes of this Memorandum, and giving Mr. Wright the benefit of all reasonable inferences, the Court will construe the Complaint to refer to the more inclusive "and."

black Chicago Bulls shirt, blue jeans with suede material, and Fila sneakers.  Detectives Dusak

and Santiago prepared detailed reports documenting their examination of the crime scene.

    While investigating the crime scene, the on-scene Defendants learned that an individual

named Roland St. James had been seen attempting to sell Ms. Talley's stolen TV.  After

following this lead, the on-scene Defendants determined that Mr. St. James, as well as a friend of

Mr. St. James, John "Buddy" Richardson, had been in possession of Ms. Talley's TV and other

items of stolen property.  Based on this finding, the on-scene Defendants instructed other police

officers to take Messrs. St. James and Richardson into custody.  Once in custody, the on-scene

Defendants and Detectives James Morton and David Baker discussed details of Ms. Talley's

murder learned by the on-scene Defendants with Messrs. St. James and Richardson.  After

Messrs. St. James and Richardson were provided details of Ms. Talley's rape and murder,

Detective Morton took Mr. St. James's formal statement concerning the crime and Detective

Baker took Mr. Richardson's formal statement.  The detectives never reported their pre-

statement discussions with Messrs. St. James and Richardson, including statements made by

Messrs. St. James and Richardson by which they incriminated themselves and exculpated

Mr. Wright, and the fact that certain detectives provided Messrs. St. James and Richardson with

details of the crime.  The on-scene Defendants simply reported that neighborhood witnesses,

including Messrs. St. James and Richardson, implicated Mr. Wright in Ms. Talley's death.

Neither Mr. St. James nor Mr. Richardson were ever charged in connection with Ms. Talley's

death or for being in possession of Ms. Talley's stolen property.  The police released both

individuals after they each implicated Mr. Wright in the crime.

    The following day, Detective Santiago and Sergeant Burke approached Mr. Wright, who

had just turned 20 years-old, at his home.  The officers asked Mr. Wright if he would accompany

3

them to the police station to discuss a murder in the area, telling Mr. Wright that they would

bring him right back.  Upon their arrival at the police station, however, Detective Santiago

placed Mr. Wright in an interrogation room.  Detective Santiago and Sergeant Burke, joined by

Detective Martin Devlin (the "interrogating Defendants"), interrogated Mr. Wright for hours,

without informing Mr. Wright of his *Miranda* rights and without recording the deposition by

audio or visual means.  Detective Devlin, who had not previously taken part in the investigation,

was included in the interrogation at the urging of Officers Santiago, Burke, and Dusak for the

express purpose of coercing a confession.  During the course of the interrogation, the

interrogating Defendants accused Mr. Wright of Ms. Talley's murder and falsely claimed that the

police had eyewitnesses and physical evidence against him.  At no point did the police tell

Mr. Wright he was free to leave or that he could call a lawyer.  Nor did the police allow

Mr. Wright to call his mother, despite his repeated request that he be permitted to do so.

Mr. Wright maintained his innocence for hours, repeatedly providing the interrogating

Defendants with details of his movements for the previous few days.

　　　　After the interrogating Defendants failed to obtain a confession, the interrogating

Defendants handcuffed Mr. Wright to a chair and presented him with a nine-page statement

handwritten by Detective Devlin.  While this statement contained inculpatory information,

Mr. Wright never made any of the statements that the document attributed to him.  Rather, the

nine-page statement was a narrative of how the Defendants believed the crime occurred and

included details meant to match Defendants' theory of the crime.  These details included

references to the believed cause of death (stabbing), the perceived sexual assault, and assertions

that Mr. Wright wore a black Chicago Bulls shirt, blue jeans with suede material, and black Fila

sneakers during the crime.  The statement also purported to establish that Mr. Wright informed

the interrogating Defendants that the clothes he wore when perpetrating the crime were in his bedroom.  The statement did not include the fact that Ms. Talley suffered blunt force trauma to the head, a fact that neither the on-scene nor interrogating Defendants were aware of at the time of Mr. Wright's interrogation.

When Mr. Wright refused to sign the fabricated statement, (i) one of the interrogating defendants threatened to "rip [Mr. Wright's] eyes out" and "skull-f**k" him, unless he confessed to the crime and signed the statement, Compl. ¶ 76; (ii) another interrogating defendant pressed Mr. Wright's neck causing him to fear that he would be choked; and (iii) the interrogating Defendants promised that if Mr. Wright signed the statement, he could go home.  Mr. Wright ultimately succumbed to the interrogating Defendants' coercion and signed the statement without even reading the statement's contents.  The interrogating Defendants also forced Mr. Wright to sign a *Miranda* waiver form, despite never informing Mr. Wright of his *Miranda* rights.  The interrogating Defendants falsely reported that Mr. Wright not only waived his *Miranda* rights, but had provided a detailed and voluntary confession within minutes of the interrogation's commencement, which, according to the interrogating Defendants, Detective Devlin transcribed verbatim from Mr. Wright's responses.  The interrogating Defendants never reported Mr. Wright's continued protestations of innocence or the details of any of the statements Mr. Wright actually made.

That same night, Detective Frank Jastrzembski obtained a warrant to search Mr. Wright's bedroom after Officers Santiago, Devlin, Dusak, and Burke informed him of Mr. Wright's alleged confession.  Detective Jastrzembski, along with Detectives Anthony Tomaino and Thomas Augustine (the "search Defendants") promptly executed the search warrant for Mr. Wright's bedroom and claimed to have found the items of clothing described in

Mr. Wright's fabricated confession statement, namely, a black Chicago Bulls shirt, blue jeans with suede material, and black Fila sneakers.  While the search Defendants reported to prosecutors and in their official reports that they found these items in Mr. Wright's bedroom, the search Defendants knew that, in actuality, the on-scene Defendants had recovered these items from Ms. Talley's home.

The day after Mr. Wright's arrest and interrogation, Defendants brought Messrs. St. James and Richardson back to the police station to provide second statements.  Detectives Tomaino and Dusak took Mr. St. James's statement and Detective Wyatt took Mr. Richarson's statement.  Messrs. St. James and Richardson's statements again implicated Mr. Wright in the crime, but otherwise deviated in material ways from their initial statements.  Detectives Tomaino, Dusak, and Wyatt failed to report the entirety of their interaction with Messrs. St. James and Richardson, including failing to report inculpatory statements made by the witnesses, exculpatory statements made concerning Mr. Wright, and details provided to the witnesses to strengthen the credibility of their statements.  Defendants, however, were aware that Messrs. St. James and Richardson lacked credibility because both had lengthy histories of criminal behavior and drug abuse and both were connected to the crime in question.  Accordingly, in order to ensure approval for Mr. Wright's arrest, the on-scene Defendants located additional teenage witnesses, aged 14 to 16, to implicate Mr. Wright in the crime.  Detectives Jastrzembski and Charles Myers took the formal statements of the teenage witnesses without their parents present.  Detectives Jastrzembski and Myers reported that the statements were verbatim transcripts of the answers to questions posed to the teenage witnesses.  The statements, which were hand-written by the detectives, implicated Mr. Wright in Ms. Talley's rape and murder.  Two of the three statements included the false detail that the teenage witnesses saw Mr. Wright wearing a Chicago

Bulls shirt or jacket.  Two of the three teenage witnesses later testified during post-conviction proceedings that their interrogators had coerced them into implicating Mr. Wright.  One of the teenage witnesses testified that his interrogator threatened that he would not see his mother again unless he testified that he saw Mr. Wright enter Ms. Talley's home.

The Defendants uniformly provided Philadelphia District Attorney's Office prosecutors with false, misleading, and incomplete information in order to obtain approval for Mr. Wright's arrest and prosecution.  Prosecutors, unaware of the fabricated confession, witness statements, and evidence, charged Mr. Wright with Ms. Talley's rape and murder.  Prosecutors utilized the fabricated confession, witness statements, and evidence to obtain a guilty verdict against Mr. Wright.  Mr. Wright was ultimately sentenced to life in prison without the possibility of parole after the jury split on whether to impose the death penalty.

After several unsuccessful post-conviction petitions in state court, the Pennsylvania Supreme Court granted Mr. Wright's request for post-conviction DNA testing.  The post-conviction DNA test and investigation revealed that the medical examiner who initially tested Ms. Talley's rape kit swabs for DNA incorrectly determined that the swabs were negative for semen and sperm.  When the vaginal and rectal swabs were retested in 2013 and 2014 respectively, the results showed the presence of DNA from a single male donor.  The DNA that was found on both swabs conclusively matched Ronnie Byrd, whose DNA was in the FBI's National DNA Index System, and conclusively excluded Mr. Wright as the source of the DNA.  As part of the post-conviction investigation, the shirt, jeans, and shoes allegedly "found" in Mr. Wright's bedroom were put through DNA testing that was not available at the time of the initial trial.  This additional testing identified Ms. Talley, not Mr. Wright, as the individual who wore the clothing items.

Based on the new DNA evidence, the District Attorney's Office agreed to vacate Mr. Wright's conviction, but decided to retry Mr. Wright based on the same fabricated confession and evidence that was presented at the initial trial. At the conclusion of the retrial, a jury took less than an hour to acquit Mr. Wright of all charges.

Mr. Wright commenced this suit on September 20, 2016.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes testing the legal sufficiency of a complaint. Although Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and internal quotation marks omitted) (alteration in original), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citations omitted). The question is not whether the claimant will ultimately prevail, but whether the complaint is "sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011).

To decide a Rule 12(b)(6) motion to dismiss, the Court may look only to the facts alleged in the complaint and its attachments. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). The Court may also consider documents that are "integral to or

explicitly relied upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985). Likewise, the Court must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989).

## IV.   DISCUSSION

### A.   Timeliness of Mr. Wright's § 1983 Claims

Defendants seek to dismiss Counts 2-4 of Mr. Wright's Complaint as untimely.[2] Defendants contend that each of the claims asserted in Counts 2-4 accrued no later than 1993, when Mr. Wright was initially tried and convicted for Ms. Talley's rape and murder, and became time barred in 1995, after the applicable two-year limitations period expired. Mr. Wright argues that all of the claims asserted in Counts 2-4 are timely because they did not accrue until the favorable termination of the criminal proceedings against him, which occurred when Mr. Wright was acquitted at the end of the retrial in August 2016. The parties' dispute is premised upon competing interpretations of the Supreme Court's decisions in *Heck v. Humphrey*, 512 U.S. 477 (1994) and *Wallace v. Kato*, 549 U.S. 384 (2007).

The statute of limitations for a § 1983 claim is governed by the limitations period provided by state law for personal injury actions. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989).

---

[2]   Count 2 contains § 1983 claims for (i) fabricating evidence and (ii) withholding exculpatory and impeachment evidence in violation of the Fourteenth Amendment. Count 3 contains a § 1983 claim for self-incrimination in violation of the Fifth and Fourteenth Amendments. Count 4 contains a § 1983 claim for civil rights conspiracy.

The statute of limitations for personal injury actions in Pennsylvania, where Mr. Wright's claims arose, is two years.  42 Pa. Cons. Stat. § 5524(2); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009).  Here, there is no dispute as to the applicable statute of limitations.  Rather, the parties dispute when the claims Mr. Wright asserts in Counts 2-4 of his Complaint began to accrue and when, then, the two years began to run.

Federal law governs the accrual date of a § 1983 claim.  *Wallace*, 549 U.S. at 388.  Under federal law, "the standard rule" is that accrual occurs "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief."  *Id.* (internal citation and quotation marks omitted) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)); *see also id.* at 391 ("Under the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages.") (citation omitted).  A § 1983 claim, however, is not cognizable if success on the claim would necessarily imply the invalidity of an underlying conviction or sentence.  *Heck*, 512 U.S. at 486-87.  In *Heck*, the Supreme Court held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* (footnote omitted).  Accordingly, pursuant to *Heck*, a § 1983 cause of action that would impugn the validity of an underlying conviction or sentence does not accrue until the underlying criminal proceedings terminate in the plaintiff's favor.  *Id.* at 489.  The rationale behind *Heck*'s

10

deferred accrual rule is "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486.

In *Wallace*, the Supreme Court clarified how courts are to analyze the accrual date for a § 1983 claim.  To determine the accrual date, courts are to look to when the statute of limitations would commence for the common-law cause of action most analogous to the plaintiff's § 1983 claim.  *Wallace*, 549 U.S. at 388-89; *see also Bradford v. Scherschligt*, 803 F.3d 382, 387-88 (9th Cir. 2015) ("To determine the proper date of accrual [of a § 1983 claim], we look to the common law tort most analogous to [plaintiff's] claim."); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 389 (4th Cir. 2014) (same); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1215 (10th Cir. 2014) (same); *Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013) (same).  While most common-law torts accrue when a plaintiff has a complete and present cause of action, *Wallace* instructs courts to take into consideration any distinctive accrual rules provided by the common law for a given cause of action.  *Wallace* 549 U.S. at 389; *see also Bradford*, 803 F.3d at 388; *Owens*, F.3d at 389.

*Wallace* addressed the accrual date of a plaintiff's § 1983 claim for a violation of his Fourth Amendment right to be free from false arrest, which the Court analogized to the common-law claim of false imprisonment.  *Wallace*, 549 U.S. at 388.  The Court explained that § 1983 claims analogous to false imprisonment are premised upon an individual's wrongful detention without legal process.  *Id.* at 389.  Applying the "distinctive" common-law accrual rule for the tort of false imprisonment, the Court held that § 1983 claims for false imprisonment accrue when the false imprisonment ends.  *Id.*  This occurs when one is released, or when one becomes held pursuant to legal process (e.g., following a formal arraignment).  *Id.*  The Court explicitly distinguished false imprisonment from the distinct tort of malicious prosecution, which results

11

from wrongful detention *pursuant to legal process*. *Id.* at 389-90. Common-law claims for malicious prosecution do not accrue until the underlying criminal proceedings terminate in a plaintiff's favor. *Id.* at 392; *Heck*, 512 U.S. at 484.

At issue here are the interrelated questions of (i) when Mr. Wright's claims accrued pursuant to the principles contained in *Wallace*, and (ii) whether the *Heck* deferred accrual rule applies to Mr. Wright's claims.

        1.   <u>Accrual of Mr. Wright's Claims</u>

Defendants' argue that Counts 2-3 of Mr. Wright's Complaint are time barred because *Wallace* stands for the proposition that plaintiffs must bring § 1983 claims as soon as possible. Mr. Wright responds that the claims asserted in Counts 2-3 most closely resemble malicious prosecution claims because they are premised on wrongful detention through the wrongful use of legal process. Accordingly, Mr. Wright argues that, pursuant to the principles contained in *Wallace*, his claims did not accrue until the termination of the criminal proceeding in his favor, namely, the jury's not guilty verdict in the retrial. The Court agrees.

Pursuant to the paradigm set up in *Wallace*, a § 1983 plaintiff's claims based on wrongful detention are either analogous to the tort of false imprisonment (if the claims are premised on wrongful detention without legal process) or the tort of malicious prosecution (if the claims are premised on wrongful detention pursuant to the wrongful use of legal process). *See Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) ("If [a victim] has been imprisoned pursuant to legal but wrongful process, he has a claim . . . analogous to a tort claim for malicious prosecution."). Here, the claims Mr. Wright asserts in Counts 2-3 are most analogous to the tort of malicious prosecution, which requires a plaintiff to demonstrate the initiation and maintenance of a criminal prosecution without probable cause. *See Kossler v. Crisanti*, 564 F.3d 181, 198 (3d Cir. 2009). In other words, malicious prosecution involves the trial process itself. Mr. Wright's

fabrication of evidence, withholding of evidence, and self-incrimination claims each involve the

Defendants' wrongful use of the trial process.  A fabrication of evidence claim, which the Third

Circuit Court of Appeals acknowledged as a tort distinct from malicious prosecution, results

from the prosecution's *use at trial* of fabricated evidence.  *See Halsey v. Pfeiffer*, 750 F.3d 273,

294 (3d Cir. 2014); *see also Bradford*, 803 F.3d at 388 (analogizing a fabrication of evidence

claim to malicious prosecution for accrual purposes); *Doswell v. City of Pittsburgh*, No. 07-761,

2007 WL 2907886, at *2 (W.D. Pa. Oct. 2, 2007) (same).  Mr. Wright's withholding of evidence

claim is similarly premised on the harm he suffered by not having access to exculpatory and

impeachment evidence *during his initial trial.  See Lambert v. Blackwell*, 387 F.3d 210, 252 (3d

Cir. 2004); *Simmons v. Beard*, 590 F.3d 223, 234 (3d Cir. 2009); *see also Owens*, 767 F.3d at

392 (analogizing withholding of evidence claim to malicious prosecution); *Johnson v. Dossey*,

515 F.3d 778, 781-82 (7th Cir. 2008) (*Brady* violation accrues upon termination of criminal

proceedings in the § 1983 plaintiff's favor).  Last, Mr. Wright's self-incrimination claim resulted

from the prosecution's use *at trial* of his coerced confession.  *Renda v. King*, 347 F.3d 550, 557-

58 (3d Cir. 2003).  Because each of these claims involved the trial process itself, they are most

analogous to malicious prosecution.[3]  *Accord Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009)

(finding that a § 1983 due process claim that "essentially contests the fairness of [a plaintiff's]

---

[3]     It certainly remains to be seen whether there is an independent cause of action under the
Fourteenth Amendment for Count 2's claim for "failing to conduct a constitutionally adequate
investigation," and the Court will not affirmatively recognize one here at this time.  However, to
the extent this claim stands for the more general proposition that the Defendants'
unconstitutional conduct throughout their investigation interfered with Mr. Wright's right to a
fair trial, then this claim would also be timely pursuant to *Heck*'s deferred accrual rule.  *See
Benckini v. Upper Saucon Twp.*, No. 07-3580, 2008 WL 2050825, at *11 (E.D. Pa. May 13,
2008) (finding that *Heck* bars § 1983 claims alleging a general interference with the right to a
fair trial); *Rosato v. N.Y. Cty. District Attorney's Office*, No. 09-3742, 2009 WL 4790849, at *2,
*4 (S.D.N.Y. Dec. 14, 2009) (finding that *Heck* barred a plaintiff's § 1983 claims premised on
"the alleged unconstitutionality of defendants' investigation and prosecution").

prosecution" is similar to a malicious prosecution claim for accrual purposes).  Accordingly, the claims asserted by Mr. Wright in Counts 2-4 did not accrue until Mr. Wright's criminal proceeding terminated in his favor upon his August 2016 acquittal.[4]  The entirety of Mr. Wright's Complaint, filed on September 20, 2016, was timely.[5]

> 2. Applicability of *Heck* to Mr. Wright's Claims

Even if *Wallace* did not govern the accrual date of Mr. Wright's claims, *Heck* would have deferred their accrual because Mr. Wright's § 1983 claims attack the validity of his prior conviction.

*Wallace* did nothing to fundamentally alter the *Heck* deferred accrual rule:  *Heck* still serves to bar § 1983 claims that, if successful, would impugn the validity of an underlying conviction or sentence.  Rather, *Wallace* was expressly limited to Fourth Amendment false imprisonment and false arrest claims.  *See* 549 U.S. at 387 n.1.  In explaining why it did not extend *Heck* to false imprisonment claims, the Court clarified that *Heck*'s deferred accrual rule applies only when there is a judgment outstanding at the time a cause of action would have otherwise accrued.  *Id.* at 393.

---

[4]     Because the Court has determined that Mr. Wright's § 1983 claims are timely, Mr. Wright's § 1983 claim for civil rights conspiracy must also be timely.  *See, e.g.*, *Rose v. Bartle*, 871 F.2d 331, 352 (3d Cir. 1989) ("[I]f the plaintiffs' malicious prosecution claims did not accrue until favorable termination, it is difficult to see how a cause of action for conspiracy to prosecute maliciously could have accrued before that date.").  *See also*, note 8, *infra*.

[5]     In *Smith v. Holtz*, the Third Circuit Court of Appeals determined that a plaintiff could meet the favorable termination requirement when there was no longer a threat of prosecution.  87 F.3d 108, 113 (3d Cir. 1996), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007).  Here, the threat of future prosecution ceased upon Mr. Wright's acquittal, not the vacatur of his conviction on September 22, 2014.  However, the Court need not determine the legal consequences of the prosecution's arguably obdurate decision to pursue a retrial or whether Mr. Wright's claims accrued upon the vacatur of his conviction or upon his subsequent acquittal, because, under either scenario, Mr. Wright's Complaint, filed on September 20, 2016, was timely.

The Third Circuit Court of Appeals had the occasion to address *Wallace* in the context of a Fourteenth Amendment claim for selective enforcement.  *See Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010).  Prior to *Wallace*'s clarification of *Heck*, the Third Circuit Court of Appeals, like other courts of appeals, had held that *Heck* barred § 1983 claims, such as selective enforcement, that implied the invalidity of pending or future convictions.  *Id.* at 186 n.8; *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety–Div. of State Police*, 411 F.3d 427, 440-41 (3d Cir. 2005) (applying *Heck* to future convictions), *overruled by Dique*, 603 F.3d at 187; *Smith*, 87 F.3d at 113 (applying *Heck* to pending convictions).  In *Dique*, however, the Third Circuit Court of Appeals held that, in light of *Wallace*, selective-enforcement claims (like false imprisonment claims) accrue when a victim is detained pursuant to legal process.  603 F.3d at 188.  The *Dique* Court distinguished selective-enforcement claims from the typical "*Heck*-type" claims that involve "the indictment and *trial process*."  *Id.* (emphasis added).

The distinction between § 1983 claims that involve the trial process and those that do not is important when determining whether or not the *Heck* deferred accrual rule applies.  Claims premised on pre-trial conduct do not necessarily imply the invalidity of a conviction.  However, when a § 1983 plaintiff seeks a determination that defendants' misconduct infected the trial process itself, then any resulting conviction would necessarily be impugned by success on the § 1983 claims.  *See, e.g.*, *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014) (distinguishing "out-of-court" conduct by the police that "does not (at least, need not) imply the invalidity" of a conviction from "claims based on proceedings in court" which do imply the invalidity of a conviction).

As discussed above, the claims contained in Counts 2-3 of Mr. Wright's complaint implicate the trial process.  Taken together, the claims suggest that nearly the entirety of

Mr. Wright's prosecution was infected by misconduct, whether by the introduction of a coerced confession or fabricated evidence or by the withholding of exculpatory and impeachment evidence.  Success on these claims would have necessarily implied the invalidity of Mr. Wright's conviction.  *See, e.g.*, *Skinner*, 562 U.S. at 536 ("[A] *Brady* claim, when successful postconviction, necessarily yields evidence undermining a conviction . . . ."); *Heck*, 512 U.S. at 479, 489-90 (success on claim based on destroying exculpatory evidence would impugn an underlying conviction); *Long v. Atlantic City Police Dep't*, 670 F.3d 436, 447 (3d Cir. 2012) (claim that defendants conspired to obtain a conviction by "committing perjury and/or fabricating evidence" barred by *Heck*); *Brookins v. Bristol Twp. Police Dep't*, 642 F. App'x 80, 81 (3d Cir. 2016) (finding *Brady* violation claim barred by *Heck*); *Alwan v. Dembe*, 603 F. App'x 68, 69-70 (3d Cir. 2015) (summarily affirming district court decision that success on plaintiff's § 1983 claims for false conviction on fabricated evidence and denied access to exculpatory material "would necessarily demonstrate the invalidity" of the underlying conviction or sentence); *James v. York Cty. Police Dep't*, 160 F. App'x 126, 133 (3d Cir. 2005) ("[T]o the extent [plaintiff's] Fifth Amendment claims were based on assertions of compelled self-incrimination, *Heck* bars their review."); *Dukes v. Pappas*, 405 F. App'x 666, 668-69 (3d Cir. 2010) ("[A] meritorious *Brady* claim, by definition, implies the invalidity of the attendant criminal conviction . . . [and] is therefore barred by [*Heck*]."); *Poventud v. City of N.Y.*, 750 F.3d 121, 132-33 (2d Cir. 2014) ("*Brady*-based § 1983 claims necessarily imply the invalidity of the challenged conviction in the trial (or plea) in which the *Brady* violation occurred.").

Defendants' arguments that Mr. Wright's fabrication of evidence, withholding of evidence, and self-incrimination claims are not subject to *Heck* are unpersuasive.

16

Defendants' argue that success on Mr. Wright's fabrication of evidence and withholding of evidence claims would not have necessarily implied the invalidity of his conviction because, in order to succeed on those claims, Mr. Wright only needs to establish a "reasonable likelihood" or "reasonable probability" of a different result but for the constitutional violations. *See Simmons*, 590 F.3d at 234 (*Brady* claim requires plaintiff to show "a reasonable probability" of a different outcome); *Halsey*, 750 F.3d at 294 (fabrication of evidence claim requires plaintiff to show "a reasonable likelihood that, without the use of that evidence, [he or she] would not have been convicted"). Essentially, Defendants argue that *Heck* is inapplicable to any fabrication of evidence or withholding of evidence claim. This is simply not true. *See, e.g.*, *Long*, 670 F.3d at 447 (fabrication of evidence claim); *Brookins*, 642 F. App'x at 81 (*Brady* claim); *Alwan*, 603 F. App'x at 69-70 (fabrication of evidence claim). The Court is also not convinced by the underlying principle of Defendants' argument—that a plaintiff's burden in a § 1983 action necessarily correlates to whether success in that action would impugn an outstanding conviction. Rather, it seems that if a plaintiff has successfully demonstrated a reasonable probability that unconstitutional conduct at trial led to a wrongful conviction, then such success *would imply* the invalidity of the prior conviction.[6]

In support of their argument that success on Mr. Wright's self-incrimination claim would not have necessarily implied the invalidity of his prior conviction, Defendants' cite the Eighth Circuit Court of Appeals decision in *Simmons v. O'Brien*, 77 F.3d 1093 (8th Cir. 1996), and two Third Circuit Court of Appeals decisions that cite *Simmons*. *See Large v. Cty. of Montgomery*,

---

[6]     Defendants also cite *Bell v. Ehrlich*, 414 F. App'x 507 (3d Cir. 2011), and *Munchinski v. Solomon*, Nos. 06-4093, 07-1345, 2007 WL 3121331 (3d Cir. Oct. 26, 2007), to support the contention that *Heck* does not apply to a withholding of evidence claim. The central holding to both cases, however, is that *Heck* did bar the claims at issue. *See* 441 F. App'x at 508; 2007 WL 3121331, at *2. Accordingly, neither case provides persuasive support for Defendants' position.

307 F. App'x 606, 608 n.1 (3d Cir. 2009); *Jackman v. Smith*, 190 F. App'x 108, 110 n.4 (3d Cir.

2006).[7]   In *Simmons*, the plaintiff alleged that the defendant police officers obtained a coerced

confession through the use of racial slurs, physical force, and failure to read plaintiff his *Miranda*

rights, among other misconduct.  77 F.3d at 1094.  The *Simmons* Court held that *Heck* did not bar

a coerced confession claim "[b]ecause harmless error analysis is applicable to the admission at

trial of coerced confessions."  *Id.* at 1095.  Accordingly, the *Simmons* Court reasoned that

success on the coerced confession claim would "not *necessarily* demonstrate the invalidity of his

conviction."  *Id.  Simmons* is distinguishable from this case in at least two respects.  First,

*Simmons* was decided over a decade before the Supreme Court's *Wallace* decision, and

therefore, without the guidance that courts should look to a § 1983 claim's common-law

analogue for accrual purposes.  Second, the Eighth Circuit Court of Appeals premised its

analysis on the harmless error doctrine.  Here, Mr. Wright alleges not only that his confession

was fabricated and coerced, but that nearly all the evidence used to convict him at his first trial

was infected by unconstitutional conduct.  Based on these allegations, the Court cannot conclude

that the introduction of Mr. Wright's coerced and fabricated confession was harmless error.

Accordingly, the Court finds that Mr. Wright's self-incrimination claim is subject to *Heck*.  *See,*

*e.g.*, *James*, 160 F. App'x at 133; *Hill v. Murphy*, 785 F.3d 242, 246-47 (7th Cir. 2015) (finding

---

[7]         Neither *Large* nor *Jackman* control the outcome here.  The *Large* Court was not
convinced that the plaintiff's *Miranda* claim, even if successful, would have necessarily implied
the invalidity of the underlying conviction because there was no "record of whether the evidence
allegedly obtained in violation of *Miranda* was even used at the criminal proceedings . . . [or
whether] other independent evidence sufficient to result in his conviction was considered as
well."  307 F. App'x at 607-08.  The facts here are demonstrably different.  Mr. Wright alleges
that his coerced confession was introduced at trial and that the remaining evidence used to
prosecute him was also fabricated.  In *Jackman*, which pre-dates the Supreme Court's decision in
*Wallace*, the Third Circuit Court of Appeals merely cited to *Simmons* as an example of a type of
claim that had been found not to be barred by *Heck*.  190 F. App'x at 109-10.  *Jackman* does not
stand for the proposition that *Heck* does not apply to Fifth Amendment self-incrimination claims.
*See, e.g.*, *James*, 160 F. App'x at 133 ("[T]o the extent [plaintiff's] Fifth Amendment claims
were based on assertions of compelled self-incrimination, *Heck* bars their review.").

self-incrimination claim to be subject to *Heck* when doctrines such as inevitable discovery, independent source, and harmless error do not operate to imply the *validity* of the underlying conviction); *Brewer v. Mayer*, No. 16-5807, 2016 WL 6821088, at *2 (E.D. Pa. Nov. 16, 2016) (finding *Heck* bars Fifth Amendment self-incrimination claim).

      *Heck* directs district courts to determine in each case whether success on a particular § 1983 claim would impugn a conviction. 512 U.S. at 487; *Gibson*, 411 F.3d at 447-49; *Strunk v. E. Coventry Twp. Police Dep't*, No. 15-2313, 2016 WL 7378075, at *2 (3d Cir. Dec. 20, 2016). Here, after due consideration of the allegations contained in Mr. Wright's Complaint, the Court finds that the claims alleged are precisely the sort of claims contemplated by *Heck*, that is, claims that, if successful, would have implied the invalidity of Mr. Wright's prior conviction.

*      *      *

      Accordingly, the Court will deny Defendants' motion to dismiss Counts 2-4 of Mr. Wright's Complaint.[8]

## B.    Mr. Wright's *Monell* Claim (Count 7)

      A plaintiff cannot succeed on a § 1983 claim against a municipality on the basis of respondeat superior. Rather, a plaintiff must show that the municipality itself was responsible for the alleged constitutional violation. *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990). A plaintiff can demonstrate municipal responsibility by establishing that "the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996). Accordingly, a municipality can only be held liable pursuant to

---

[8]     Because the Court finds the claims contained in Counts 2-3 of Mr. Wright's Complaint to be subject to *Heck*, the civil rights conspiracy claim contained in Count 4 is also necessarily subject to *Heck*. *Accord Rose v. Bartle*, 871 F.2d at 352; *Baker v. City of Hollywood*, 391 F. App'x 819, 821 (11th Cir. 2010) (*Heck* bars civil rights conspiracy claim where success on the conspiracy claim would impugn the underlying conviction). *See also*, note 4, *supra*.

§ 1983 if a plaintiff's claim is premised upon a municipal policy or custom.  *Id.*; *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009).  The Third Circuit Court of Appeals has explained:

> A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanently and well-settled' as to virtually constitute law.

*McTernan*, 564 F.3d at 658 (quoting *Andrews*, 895 F.2d at 1480).  Whether a plaintiff's claim is premised on a municipal policy or a municipal custom, a plaintiff must demonstrate "that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews*, 895 F.2d at 1480.

The Third Circuit Court of Appeals has acknowledged, however, that even at summary judgment, a plaintiff need not specifically identify a responsible policymaker if the plaintiff has demonstrated a custom that is so permanent and well settled as to have the force of law, such that the custom can be ascribed to municipal policymakers. *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986).  Accordingly, a plaintiff can survive a motion to dismiss a *Monell* claim without alleging conduct by a specific municipal policymaker by pleading facts that allow a court to infer that he or she sustained a constitutional injury as a result "of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks omitted) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); *Boyden v. Twp. of Upper Darby*, 5 F. Supp. 3d 731, 743 (E.D. Pa. 2014).

The City's motion does not appear to dispute the sufficiency of the factual allegations contained in Mr. Wright's Complaint.  Rather, the City attacks Mr. Wright's *Monell* claim only on the basis that the Complaint does not identify a specific municipal policymaker and does not contain any factual allegations pertaining to conduct by a specific municipal policymaker.  The question, then, is whether the Complaint adequately alleges unconstitutional practices that were sufficiently widespread as to be ascribed to municipal policymakers.

Here, Mr. Wright alleges no fewer than eight specific customs, practices, or policies maintained or indulged by the City at the time of his arrest and prosecution that led to his constitutional injury, including, but not limited to:  (i) using coercive techniques to obtain confessions, such as threats of violence, false promises, and the use of prolonged interrogations; (ii) fabricating incriminating statements from witnesses, by, for example, separating juveniles from their parents and providing witnesses with details of the crime only the perpetrator or police could know; (iii) fabricating inculpatory evidence; (iv) withholding exculpatory evidence; (v) failing to adequately discipline officers who engaged in unconstitutional conduct; (vi) failing to adequately train and supervise officers; (vii) ignoring systematic police misconduct and abuse of civilians' rights; and (viii) failing to discipline officers who failed to report the unconstitutional conduct of fellow officers.  In support of his contention that these practices were sufficiently widespread as to be ascribed to municipal policymakers, Mr. Wright's Complaint sets forth at least eight separate instances in the years immediately before and after the investigation into Mr. Wright in which officers from the Philadelphia Police Department, including some of the same officers named in this case, engaged in the type of misconduct that is alleged to have occurred here.[9]  *See Beck*, 89 F.3d at 972 (explaining that post-incident conduct

---

[9]       The Complaint also details (i) three court orders from the mid to late 1980s directing the Philadelphia Police Department to cease unconstitutional activities and (ii) a 1996 consent decree

may be relevant when considering "whether the City and policymakers had a pattern of tacitly approving" unconstitutional practices).

These allegations, taken as true for purposes of this motion to dismiss, allow the Court to infer that the unconstitutional practices of the Philadelphia Police Department caused Mr. Wright's injuries and were sufficiently widespread as to be ascribed to municipal policymakers. Accordingly, the Court will deny the City's motion to dismiss Mr. Wright's *Monell* claim.

### C.   Claims Against Detectives Baker, Dusak, and Wyatt

In order to sustain a § 1983 claim against an individual acting under the color of state law, a plaintiff must demonstrate that the defendant was personally involved in the alleged violations of his or her federal rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* If a plaintiff attempts to premise his or her § 1983 claim on a defendant's "actual knowledge and acquiescence," the plaintiff's allegations "must be made with appropriate particularity." *Id.*

Defendants argue that Mr. Wright has not established the personal involvement of Detectives Baker, Dusak, or Wyatt because the Complaint does not set forth specific allegations as to these detectives.[10] Defendants contend that the Complaint merely alleges that Detectives Baker, Dusak, and Wyatt were homicide detectives at the time of the investigation and that each took witness statements implicating Mr. Wright in Ms. Talley's rape and murder. Mr. Wright

---

requiring reforms within the Philadelphia Police Department arising out of a pattern of unconstitutional conduct in the late 1980s and early 1990s perpetrated by a narcotics unit operating out of the same geographic location as Ms. Talley's rape and murder.

[10]      The claims asserted against Detectives Baker, Dusak, and Wyatt are (i) malicious prosecution (Counts 1 and 8); (ii) due process violations, including fabricating and withholding evidence (Count 2); (ii) civil rights conspiracy (Count 4); and (iii) failure to intervene (Count 5).

responds that, taking all facts alleged in the Complaint as true and drawing all reasonable factual inferences in his favor, the Complaint contains sufficient factual allegations against Detectives Baker, Dusak, and Wyatt to survive this motion to dismiss.

Defendants support their argument with cases standing for the proposition that generic allegations as to "all defendants," that are specific to no individual defendant, do not plausibly allege a claim for relief against specific defendants. *See, e.g.*, *Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*, No. 13-2052, 2014 WL 4675316, at *4 (D. Del. Sept. 19, 2014) ("[A]llegations, specific to no Defendant and generic as to all, are unhelpful in further flushing out a facially plausible claim . . . ."); *Banks v. Dictorate, Science & Tech. Ctr. (CIA)*, No. 13-1712, 2014 WL 1278097, at *7 (W.D. Pa. Mar. 27, 2014) ("Plaintiff fails to assert any facts to show or suggest what actions the newly named defendants allegedly took, or when these actions allegedly occurred, but merely lumps them together in his generic reference to 'Defendants' throughout his disorganized ramblings and conclusory allegations."); *see also In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) (finding that "mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form" failed to connect particular defendants to an antitrust conspiracy).

The allegations against Detectives Baker, Dusak, and Wyatt, however, do not rely solely on generic references to "all defendants." Rather, there are specific allegations, or at the very least inferences can be drawn based on the current allegations, that Detectives Baker, Dusak, and Wyatt were each personally involved in the alleged conspiracy to frame Mr. Wright for Ms. Talley's rape and murder. Furthermore, the Complaint's tendency to create sub-groups of defendants, such as the "on-scene Defendants," is not a basis for this Court to dismiss for failure to state a claim. While Mr. Wright will ultimately have to prove that each individual defendant

23

violated his constitutional rights to survive summary judgment or succeed at trial, at this stage of the case, before the completion of discovery, it is sufficient for a plaintiff to identify a sub-group of defendants as responsible for particular, stated constitutional wrongs. *See, e.g.*, *Burgess v. Baltimore Police Dep't*, No. 15-834, 2016 WL 795975, at *10 (D. Md. Mar. 1, 2016) (allowing a complaint utilizing the term "Officer Defendants" to survive a motion to dismiss where the plaintiff could not identify the specific officers responsible for each alleged constitutional violation because discovery had not been completed); *Mincy v. McConnell*, No. 09-236, 2010 WL 3092681, at *3-*4 (W.D. Pa. July 15, 2010) (allowing a complaint to survive a motion to dismiss where the complaint alleged violations by a defined subgroup without specifically naming individual defendants).

The Complaint's allegations provide more than enough to detail to give Detectives Baker, Dusak, and Wyatt notice of the nature and basis of the claims against them. *See Twombly*, 550 U.S. at 555. The Complaint alleges that Detectives Baker, Dusak, and Wyatt each had personal involvement—either individually or as part of a descriptively defined subgroup of defendants— in (i) knowingly eliciting or coercing fabricated witness testimony and (ii) concealing that misconduct from prosecutors and Mr. Wright. Furthermore, with regard to Detective Dusak, Mr. Wright alleges that Detective Dusak, as the lead investigator, was responsible for overseeing the investigation and gathering the evidence obtained by other officers. This allegation is sufficient to draw the reasonable inference that Detective Dusak had actual knowledge of, or acquiesced in, the misconduct detailed throughout the Complaint. Accordingly, the Court finds that the Complaint contains sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 678). The Court

will therefore deny Detectives Baker, Dusak, and Wyatt's motion to dismiss all claims against them.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is denied.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

25