## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY WRIGHT,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 16-5020** |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| **Defendants** | : | |

### MOTION OF THE PHILADELPHIA DISTRICT ATTORNEY'S
### OFFICE TO ENFORCE CONFIDENTIALITY AGREEMENT

The Philadelphia District Attorney's Office (the "DAO"), by and through undersigned

counsel, respectfully moves the Court to enjoin Counsel for Plaintiff Anthony Wright from

dissemination of files designated as "confidential" by the City of Philadelphia or the DAO

pursuant to the Court's confidentiality order of March 1, 2017.  (ECF No. 44.)  The DAO further

moves the Court to order Plaintiff's Counsel to comply with the Court's confidentiality order by

retrieving all confidential files from unauthorized recipients.

In support of this motion, the DAO references and incorporates the attached

memorandum of law.

Respectfully submitted,

*/s/ Michael Scalera*

Date: July 20, 2017

Michael Scalera
Assistant District Attorney
PHILADELPHIA DISTRICT ATTORNEY'S OFFICE
Three South Penn Square
Philadelphia, PA  19107
P:  215-686-5774
F:  215-686-5725
E:  michael.scalera@phila.gov
*Counsel for the Philadelphia District Attorney's*
*Office*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY WRIGHT,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 16-5020** |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| **Defendants** | : | |

### THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ENFORCE CONFIDENTIALITY AGREEMENT

To demonstrate an unconstitutional custom by the City of Philadelphia (the "City") pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Plaintiff's Counsel sought and obtained police homicide files in a number of prosecutions involving the named defendants in this action. But it soon became apparent that Plaintiff's Counsel had an additional motive for procuring these files: they promptly turned them over to the Pennsylvania Innocence Project for use in several current and potential petitions under the Pennsylvania Post-Conviction Relief Act, (the "PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.* By doing so, Plaintiff's Counsel is allowing state-court PCRA petitioners to substitute the broad discovery standards of the Federal Rules of Civil Procedure for the far more restrictive PCRA rules established by the Pennsylvania Legislature and the Pennsylvania Supreme Court.[1]

Thus, what *should* be a straightforward discovery process to resolve Mr. Wright's claims against the City has metastasized into a barely-concealed attempt to provide expansive (and, under state law, disallowed) discovery to state-court PCRA petitioners. In the process, Plaintiff's

---

[1] *See* Pa. R. Crim. P. 902(E)(1) ("Except as provided in paragraph (E)(2) [governing capital cases], no discovery shall be permitted at any stage of the [postconviction] proceedings, except upon leave of court after a showing of exceptional circumstances."); *see also* Comment, Pa. R. Crim. P. 901 (noting that Rule 902(E)(1) "implements 42 Pa. C.S. § 9545(d)(2)").

Counsel has forced the District Attorney's Office (the "DAO") and the Pennsylvania Innocence Project to intervene in this federal action to determine their respective rights and obligations regarding discovery in state-court PCRA proceedings.  But asking this Court to manage discovery in state postconviction proceedings is an improper use of the federal forum; more saliently, it violates the Court's confidentiality order of March 1, 2017.  (*See* Conf. Agmt. & Order, ECF No. 44 (the "Agreement" or "Confidentiality Agreement."))  As demonstrated below, Plaintiff has been in violation of the Court's confidentiality order for over a month; absent the Court's intervention here, they will continue to violate the confidentiality order until the Court rules on the City's confidentiality designations in October, at the earliest.  (*See* July 19, 2017 Order, ECF No. 75 (scheduling hearing on designations for October 2, 2017).)  The Court should therefore order Plaintiff to comply with the Court's confidentiality order by retrieving the homicide files pending a ruling on the confidentiality designations.

## I.      BACKGROUND

On June 13, 2017, Marissa Bluestine of the Pennsylvania Innocence Project sent a letter to B.J. Graham-Rubin, Director of the DAO's Conviction Review Unit, in which she revealed that the Innocence Project had "recently been provided a copy of the Homicide File for [the Veasy] case, provided by the City of Philadelphia as part of their discovery obligations in a civil suit filed by Anthony Wright . . . ."  *See* M. Bluestine Letter 2, attached as Exhibit B.  In response, the City invoked its right under the Confidentiality Agreement to retroactively designate the homicide files as confidential.  *See* June 15, 2017 M. Miller Email, attached as Exhibit C.  Plaintiff's Counsel objected to the confidentiality designations, *see* June 16, 2017 F. Heydari Email, attached as Exhibit D; June 21, 2017 F. Heydari Email, attached as Exhibit E, but Counsel never attempted to retrieve the files pending resolution of the issue, as paragraph eight

2

of the Agreement requires.  (*See* Conf. Agmt. & Order ¶ 8.)  Plaintiff did not file a motion

challenging the confidentiality designations until three days ago, when the DAO informed

Counsel that it planned to seek Court intervention to enforce the Confidentiality Agreement.

(*See* Pl.'s Mot. Strike, ECF No. 72.)

On July 5, 2017, a conference call was held between John Summers, who is *pro bono*

counsel for PCRA petitioner Willie Veasy; Ms. Bluestine, of the Innocence Project; and counsel

for Plaintiff, the DAO, and the City.[2]  Counsel for the DAO stated that the DAO planned to seek

Court intervention to settle the dispute.  But Plaintiff's Counsel suggested that the parties instead

exchange position statements by Friday, July 14, and that the parties maintain the status quo in

the interim by not further disseminating the homicide files.  Counsel for the DAO stated that the

appropriate status quo was for Plaintiff's Counsel to retrieve the files pending resolution of the

issue, but the parties insisted that a promise of no further dissemination was sufficient.  The

DAO reluctantly conceded.  Mr. Summers and Ms. Bluestine were silent.

On Wednesday, July 12, Ms. Bluestine informed the Chief of the DAO's PCRA unit that

she intended to file an amended PCRA petition on behalf of a convicted murderer, Andrew

Swainson, based on documents obtained from Plaintiff's Counsel in the Wright litigation.  Ms.

Bluestine explained that, to avoid an alleged procedural bar, the petition needed to be filed by

Thursday, July 13—coincidentally (or perhaps not), the day before the DAO and Plaintiff's

Counsel were to exchange position statements, at Plaintiff's Counsel's urging.  The DAO

objected, arguing that there was no such procedural bar and that submitting documents from the

homicide files to the PCRA court violated the agreement that there would be no further

---

[2] For a fuller account of the negotiations between the parties, see the DAO's certification
pursuant to Local Rule 26.1(f), attached as Exhibit A.

dissemination of the confidential files pending a resolution of the files' status.  Referencing his

and Ms. Bluestine's silence on the conference call when the parties agreed not to further

disseminate the files, John Summers replied that "the Project made no agreement about any

continued use or dissemination of the documents."  *See* J. Summers Email, attached as Exhibit F.

The DAO responded that it "f[ou]nd it very hard to believe that anyone participating in that

phone call could have walked away thinking the 'status quo' agreement did not apply to them,"

and that it was

> especially disconcerting [] that, as we now know, at the time of the meet and confer
> call the Innocence Project apparently knew that it would be filing a supplemental
> PCRA petition in the case of Mr. Swainson based on the confidential homicide files
> received from Mr. Wright's attorneys.  Yet, despite that fact, they remained silent
> as the other parties on the call agreed to maintain the "status quo."

July 17, 2017 B. Hughes Email, attached as Exhibit G.  The DAO asked Plaintiff's Counsel to

confirm that they would comply with their obligation under the Confidentiality Agreement to

claw back the homicide files.  *Id.*  Instead, Plaintiff filed his motion to strike the designations,

and the Innocence Project was granted permission to intervene in this action.  (*See* July 19, 2017

Order.)

## II.    ARGUMENT

Plaintiff's failure to use reasonable efforts to retrieve the homicide files when the City

designated them as confidential violates the plain language of the Confidentiality Agreement.

More generally, using discovery in this federal action to evade the postconviction collateral

procedures enacted by the Pennsylvania Legislature and Supreme Court is offensive to

traditional notions of federal-state comity, as well as Congress's directive that those who seek to

challenge their convictions exhaust their state postconviction remedies before using the federal

courts to advance their case.  *See* 28 U.S.C.A. § 2254 (requiring exhaustion of state remedies

before seeking habeas relief in federal court).  In fact, when the Innocence Project received the Swainson homicide file from Plaintiff's Counsel, a motion for production of that file was *already pending* in PCRA court.  *See* July 13, 2017 B. Hughes Email, attached as Exhibit H.  Absent this Court's intervention, that motion is now moot.  Accordingly, the Court should grant the DAO's motion and order Plaintiff's Counsel to retrieve the confidential homicide files.

The City retroactively designated the homicide files as confidential pursuant to paragraph 8 of the Agreement, which, in the event of a failure to designate upon production, permits "the producing party or the DAO [to] subsequently designate the document or information as 'Confidential' . . . ."  (Conf. Agmt. & Order ¶ 8.)  At that point, "such information shall be treated as designated by the producing party or the DAO . . . and the party or parties to whom such undesignated documents were produced shall use reasonable efforts to retrieve said documents . . . ."  (*Id.*)  Once the City designated the homicide files as confidential, then, Plaintiff's Counsel was obligated to treat them as such by retrieving them from the Innocence Project—even if they disputed the City's designations.  (*See id.* ¶ 6.b. (requiring parties to treat designated material as confidential "unless and until an Order of the Court changing the designations is entered")).  They did not; nor have they evinced any intention to do so pending the Court's ruling on the designations in October.  In the interim, the Innocence Project likely will continue to use the improperly retained homicide files to evade the PCRA's discovery rules. This is a clear violation of the Court's order implementing the Confidentiality Agreement.  *See Dorsett v. Cnty. of Nassau*, No. 10-01258, 2012 WL 2076911, at *8 (E.D.N.Y. June 7, 2012) (holding party in contempt for violation of confidentiality order).

## III.   CONCLUSION

For the foregoing reasons, the Court should enjoin Plaintiff from further dissemination of any materials designated as confidential, and order Plaintiff's Counsel to retrieve all confidential materials from unauthorized parties.

Respectfully submitted,

Date: July 20, 2017

*/s/ Michael Scalera*
Michael Scalera
Assistant District Attorney
PHILADELPHIA DISTRICT ATTORNEY'S OFFICE
Three South Penn Square
Philadelphia, PA  19107
P:  215-686-5774
F:  215-686-5725
E:  michael.scalera@phila.gov
*Counsel for the Philadelphia District Attorney's Office*

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY WRIGHT,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 16-5020** |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| **Defendants** | : | |

**CERTIFICATION PURSUANT TO LOCAL RULE 26.1(F)**

Pursuant to Local Rule 26.1, undersigned counsel certifies that he has engaged in good

faith efforts to resolve this discovery dispute as follows:

- In February 2017, on behalf of the Philadelphia District Attorney's Office (DAO), undersigned counsel negotiated with counsel for Plaintiffs and Defendants in the instant action regarding the entry of a Confidentiality Agreement governing the production of records pursuant to subpoenas and discovery. That agreement was subsequently executed by counsel for the DAO, Plaintiff, and Defendants, and, on March 1, 2017, this Court reduced that agreement to an Order. (ECF No. 44).

- On or about June 15, 2017, undersigned counsel learned that attorney Marissa Bluestine, of the Pennsylvania Innocence Project, had submitted a letter to the DAO's Conviction Review Unit (CRU) requesting that it open a formal investigation regarding the prosecution of a convicted murderer, Willie Veasy. Ms. Bluestine's letter indicated that the basis of this request was the police homicide file, which she had received from Plaintiff Anthony Wright's attorneys after production by the City of Philadelphia in discovery in the instant action. Ms. Bluestine subsequently filed, on behalf of Mr. Veasy, a petition under Pennsylvania's Post Conviction Relief Act (PCRA) based on the same documents.

- Immediately upon learning of the dissemination by Plaintiff's attorneys to Ms. Bluestine, undersigned counsel contacted an attorney for Defendants and requested that the City designate all homicide files it had produced during discovery as confidential under the parties' Confidentiality Agreement. The City made that designation on or about the same date as this request, June 15. In the event of a retroactive designation, the Confidentiality Agreement requires the disseminating party to claw back the confidential documents in question.

- By email dated June 21, 2017, Plaintiff's counsel advised of Plaintiff's objection to the designation of confidentiality, and further advised that homicide files for five different murder prosecutions – Combs, Hernandez, Ogrod, Swainson, and Veasy – had been previously provided by Plaintiff's counsel to Ms. Bluestine.

- After a series of email exchanges, a telephone conference was held on July 5, 2017, between Plaintiff's counsel (Farhang Heydari and Paul Messing), Defendants' counsel (Michael Miller), counsel for the Pennsylvania Innocence Project (John Summers and Ms. Bluestine), and counsel for the DAO (BJ Graham-Rubin, Michael Scalera, and the undersigned attorney).  The purpose of this phone conference was to attempt to resolve the dispute regarding Plaintiff's counsel's production of the documents in question to the Innocence Project and the subsequent designation of the homicide files as confidential. After the parties discussed their respective positions, the undersigned attorney opined that there appeared to be at an "impasse" that would require resolution by the Court.  Plaintiff's counsel and counsel for the Innocence Project disagreed that the parties were at impasse and suggested that the undersigned attorney draft a memorandum of law setting forth the relatively straightforward position he had just articulated during the call.  Counsel for the Innocence Project, Mr. Summers, agreed to provide a similar memorandum to the DAO and suggested that these documents be exchanged on July 14.  Undersigned counsel, who had previously agreed to provide the requested memorandum by July 7, agreed to the proposed exchange on July 14.  Counsel for Plaintiff then suggested that, in the interim, the "status quo" would be maintained.  Undersigned counsel inquired as to the meaning of "status quo."  Plaintiff's counsel stated this meant that the homicide files would not be subject to any further dissemination pending the outcome of the parties' dispute. Undersigned counsel opined that this was insufficient, that the Confidentiality Agreement required that the confidential records be clawed back by the disseminating party upon designation.  When all other counsel on the call maintained that clawback was unnecessary in light of the agreement not to further disseminate the files, the undersigned counsel reluctantly assented to Plaintiff's counsel's proposed definition of the "status quo."

- On July 12, undersigned counsel learned from Assistant District Attorney Robin Godfrey, Chief of the DAO's PCRA Unit, that Ms. Godfrey had been contacted by Ms. Bluestine, who advised that she would be imminently filing a supplemental PCRA petition on behalf of convicted murderer Andrew Swainson based on records in the homicide file she had obtained from Plaintiff's counsel.  In response, Ms. Godfrey advised Ms. Bluestine, *inter alia*, that, after consultation with the undersigned attorney and other attorneys in the DAO, the filing of a supplemental PCRA petition based on Mr. Swainson's homicide file, which had been designated as confidential, would violate the "status quo" agreement reached between the parties on the July 5 conference call.  Moreover, Ms. Godfrey advised that a motion for discovery of the homicide file, filed by Mr. Swainson's prior counsel, was pending before the PCRA court at that time, and that the production of the homicide file constituted an improper circumvention of PCRA discovery rules.

- By email dated July 13, Mr. Summers advised that he had been retained to represent the Pennsylvania Innocence Project in this matter and disputed all prior positions asserted by the DAO.  Of note, Mr. Summers advised that, while Plaintiff's counsel agreed to maintain the "status quo" during the July 5 phone conference, no such agreement was made by himself or Ms. Bluestine on behalf of the Innocence Project and, therefore, they were not bound.  By email of the same date, the undersigned attorney advised Mr. Summers of the DAO's position to the contrary and that, in light of Mr. Summers' position, the DAO had no recourse other than to file a motion to intervene in the instant matter to seek enforcement

2

of the Confidentiality Agreement and, consequently, that it would not be exchanging memoranda as previously anticipated.

- On July 14, as the DAO was preparing its motion to intervene and attached motion to enforce the confidentiality agreement, the undersigned attorney was contacted, by phone, by Mr. Heydari, who proposed a temporary reconciliation. Mr. Heydari subsequently indicated that he had reached out to Mr. Summers, who had agreed to abide by the "status quo" agreement, and that he was attempting to reach an agreement with Ms. Bluestine to the same effect. Undersigned counsel reiterated the DAO's position that the Confidentiality Agreement required claw back of the documents by Plaintiff's counsel, to which Mr. Heydari responded that he would be unable to claw back the documents from Ms. Bluestine. Nevertheless, undersigned counsel agreed to refrain from filing pending Ms. Bluestine's anticipated agreement by July 17.

- By email on July 17, Mr. Summers "propose[d] that the Project would agree to not file a PCRA petition based on the Homicide File[s] for the next 10 days, as this dispute is orderly heard and resolved." On the same date, undersigned counsel advised that this proposal was "insufficient," as it would permit the Innocence Project to continue reviewing the improperly disseminated files and prepare petitions, thereby circumventing the federal and state rules governing discovery in postconviction matters. With respect to Mr. Summers' suggestion that the Innocence Project attorneys were not bound by the "status quo" agreement, undersigned counsel opined that he found "it very hard to believe that anyone participating in [the July 5] phone call could have walked away thinking the 'status quo' agreement did not apply to them," particularly where, "as we now know, at the time of the meet and confer call the Innocence Project apparently knew that it would be filing a supplemental PCRA petition in the case of Mr. Swainson based on the confidential homicide files received from Mr. Wright's attorneys." The DAO advised that "[u]nless there is an agreement to immediate claw back from the Innocence Project by Mr. Wright's attorneys by the close of business today, we will be seeking relief from the court."

- On the evening of the same date, Plaintiff's counsel filed their Motion to Strike Defendants' Confidentiality Designations. (ECF No. 72). The following day, July 18, the Innocence Project filed its Motion to Intervene and attached Motion to Strike Confidentiality Designations of Homicide Files. (ECF Nos. 73, 73-1). The next day, July 19, counsel for Defendants filed their Opposition to Plaintiff's Motion to Strike (ECF No. 74). The Court granted the Innocence Project permission to intervene and ordered the DAO to file a brief in support of the City's designations. (ECF No. 75.) The DAO now submits its Motion to Intervene and attached Motion to Enforce Confidentiality Agreement.

Respectfully submitted,

/s/ Bryan C. Hughes
BRYAN C. HUGHES
Chief Assistant District Attorney
Civil Litigation Unit
Philadelphia District Attorney's Office

3

# Exhibit B



PENNSYLVANIA
INNOCENCE
PROJECT

Richard C. Glazer
Executive Director

at Temple University
Beasley School of Law

1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255
*www.innocenceprojectpa.org*
*innocenceprojecta@temple.edu*

Marissa Boyers Bluestine
Legal Director

June 13, 2017

BJ Graham-Rubin, Esquire
Director
Andrew Wellbrock, Esquire
Assistant Director
Conviction Review Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107-3499

**Re:     Commonwealth v. Willie Veasy**
         **Docket No.: CP-51-CR- 0641521-1992**

Dear BJ and Andrew:

I am writing to request the CRU open a full investigation and review of Willie Veasy's murder conviction from 1992. Mr. Veasy was convicted of second-degree murder for the killing of John Lewis and wounding Efraim Gonzalez on February 19, 1993.

There were at least 6 identified witnesses to the shooting. Of those, only one—a woman named Denise Mitchell with self-described eyesight of "40/100"—identified Mr. Veasy at trial. In addition to Ms. Mitchell's identification, the jury heard that Mr. Veasy had "confessed" to the crime—a confession which varied from every eyewitness' statements in significant ways. The confession was taken by Detectives Martin Devlin and Paul Worrell—the same detectives involved in both the Anthony Wright and Shaurn Thomas cases. Moreover, Mr. Veasy maintained he was working at a Houlihan's in Jenkintown as a dishwasher when the murder occurred 8 miles away (and a 29 minute drive in light traffic) on Russell Street in Philadelphia. Mr. Veasy's presence at the Houlihan's was corroborated at trial by his timecards from the restaurant as well as two witnesses who testified that had he left for any period of time it would have been disastrous to the operations of the busy kitchen.

Recently, in connection with Mr. Thomas's case, you provided witness statements from several men initially suspected in the murder of Domingo Martinez—Lloyd Hicks, Andrew Bagwell, and John Lewis. Mr. Lewis is the decedent here; Mr. Bagwell was standing next to him when he was shot and testified he did not see the shooter at Mr. Veasy's trial, and Mr. Hicks testified he saw the shooters moments before the shots were fired but did not witness the murders. The fact the men had been questioned and, presumably, remained suspects in the murder of Domingo Martinez was never disclosed to Mr. Veasy's counsel (nor, likely, to the commonwealth's representative, Mark Gilson). This overlap between the two crimes was never investigated, and counsel did not have the opportunity to present any information regarding this issue at trial. In addition, what Mr. Walthour describes at the hands of Detective Devlin mirrors what both Stallworth brothers and Mr. Veasy say happened when the detective interviewed them.

In addition to those statements, we have recently been provided a copy of the Homicide File for this case, provided by the City of Philadelphia as part of their discovery obligations in a civil suit filed by Anthony Wright following his acquittal last year after serving 25 years in prison. Contained within the file were multiple pieces of exculpatory evidence that had never been disclosed. Some of that evidence points to other suspected perpetrators, and seriously calls into question what the sole identifying witness saw (and her identification of Mr. Veasy as the perpetrator). Had the information been available to Mr. Veasy's trial counsel, he would have had another viable approach to defending the case which would have, in all likelihood given the evidence presented, resulted in a different outcome.

Because of the nature of the materials recently obtained, we are required to file a PCRA petition for Mr. Veasy no later than July 2. We are writing to you now in the hopes of reviewing the police homicide and DA file on the matter (to ensure the evidence was not, in fact, provided to counsel), to alert you to the pending petition, and to request your assistance in reviewing Mr. Veasy's case.

### *The Murder of John Lewis*

It was not clear, from the first 911 call, exactly what happened just before 10 PM on January 24, 1992, on 700 West Russell Street.[1] Witnesses said men arrived on the street in a red car (a fact that did not change with any of the multiple witnesses). From there, accounts diverge. Some said the men in the car were shooting as they drove up the street; some said one man got out and engaged with victim Efraim Gonzalez; some said two men got out and began shooting.

The commonwealth's theory at trial centered around the testimony of Denise Mitchell. Ms. Mitchell said she was in the 2nd floor of her house and saw a man get out of the red car, tug at Gonzales, then shoot him on the sidewalk at 712 Russell Street.  Across

---

[1] The decedent, John Lewis, was a suspect in the murder of Domingo Martinez at the time of his death. Mr. Martinez was murdered on the 700 block of West Sedgley Street – within 2 blocks of where Mr. Lewis died.

the street, John Lewis was walking down the street with a friend, Andrew Bagwell, when the same gunman turned toward them and fired several shots, one of which struck Lewis in the head.  The gunman got back in the front passenger seat of the red car, and it sped away, turning south onto 8th Street.

### *The Police Investigation – from discovery provided at trial*

Police arrived on the scene in response to multiple calls to 911 regarding a shooting. The calls seemed to indicate a car had pulled up to the 700 block of West Russell Street and shots were fired as the car drove along the block. When police arrived, they found Efraim Gonzalez on one side of the road, and John Lewis on the other. Both were taken to the hospital. Mr. Gonzalez survived his injury, but Mr. Lewis did not.

Several hours after the shooting, police brought Denise Mitchell to the district to talk to detectives. She told police she heard a commotion followed by a gunshot. She went to her window and saw a male she knew as "Pee Wee" with a gun. She saw Pee Wee shoot Mr. Gonzalez, but did not see Mr. Lewis get shot. She said Pee Wee got out of a small red car on the driver's side, struggled with Mr. Gonzalez, shot him, then returned to the car.

Another witness, Henry Montero, told police he saw a red car pull up on the block, and saw Mr. Gonzalez approach the car. He said Mr. Gonzalez was shot by men who were inside the car, and the men never got out. He saw three men in the small, 4-door, red car. He couldn't describe any of the occupants.

Andrew Bagwell told police he was with John Lewis when he was shot. He did not see the car, but saw a man a little taller than himself (Bagwell was 5'6") shooting. He and Lewis ran, but Lewis got shot.

Police eventually came to believe "Pee Wee" was Willie Veasy (it is still unclear how that connection was made). They showed Ms. Mitchell a photo array with his picture, but she did not make an identification, telling detectives she did not have time. They returned, and she identified Mr. Veasy the second time as well as Lyndell Johnson, a man suspected in the murder but who was, from what we can tell, never located and who has never been arrested for these crimes.

On June 9, 1992, police arrested Willie Veasy at his home, where he lived with his parents. They took him directly to the PAB, where detectives questioned him about the shootings.

### *Mr. Veasy's Interrogation*

Willie Veasy was arrested at 6:35 AM on June 9, 1992. Detectives Worrell and Devlin began their interrogation of Mr. Veasy at 8:01 AM. They testified at trial the oral interrogation lasted about 30 to 35 minutes, in a small, windowless room with only a table and chair bolted to the floor. No recording was made or attempted.

The interrogation was then reduced to writing at 10:05 AM. The detectives did not tell Mr. Veasy the date the murder occurred, saying only that it occurred in January, before beginning to question him. Mr. Veasy originally contended he had nothing to do with the crime, that he didn't even know what they were talking about. However, after the police told him he was under arrest, and that he'd go to trial because "several" witnesses said they saw Mr. Veasy that night, things changed.

According to the detectives, Mr. Veasy told the police he was playing basketball when a guy named Lyndell picked him up in a blue four-door car with two other males in the back seat. Lyndell told him they were going to "get some dudes" who had robbed Lyndell days earlier. Lyndell gave Mr. Veasy a gun, and he got in the blue car in the front passenger seat. They drove to 7th and Russell, when Lyndell got out and soon started shooting. A Spanish guy got out from the back of the car and started shooting, followed by the other guy who got out and started shooting as well. Mr. Veasy then said they all got back in the car, and they pulled away. Mr. Veasy's statement says he received $150 for his part in the shooting.

Detective Rocks entered the interrogation room at 10:30 AM to resume questioning Mr. Veasy. At this point the statement says that when Lyndell got out of the car, Mr. Veasy got out as well. It then says Mr. Veasy heard bullets hitting the car from two Puerto Rican-looking guys on the corner, and that he fired twice at them. This part of the interrogation ended at 10:50 AM.

"Lyndell" was never located, and Mr. Veasy was the only one arrested and apprehended for the crimes. It appears police pulled an address for Lyndell—from 11th Street—and he had an open VUFA case at the time. There is no indication any attempt to locate or interview him was done.

### The Trial

After motions to suppress Ms. Mitchell's identification and Mr. Veasy's statement were denied, the case proceeded to trial in front of Judge Poserina. The case was charged capital. Mark Gilson was the prosecutor, and Mr. Veasy was represented by Jules Epstein and Thurgood Matthews as his second chair. Commonwealth witnesses Ms. Mitchell, Mr. Bagwell, and Mr. Montero told the jury about the shooting itself, primarily consistent with their statements to police. Detective Worrell testified and read Mr. Veasy's statement—that there were 4 men in a blue car, and that 3 of them were shooting—to the jury.

**Alibi and Other Exculpatory Witnesses.** The defense presented several witnesses to establish that Mr. Veasy was working the night of the shooting at the Houlihan's restaurant in Jenkintown, at least a 20-minute drive away from the 700 block of Russell Street. They presented Houlihan's employees to verify Mr. Veasy's timecard showing he punched in at 5:59 PM on Friday, January 24, 1992, and punched out at 1:52 AM the next

day—covering not only the shooting, but the time in which the shooters were alleged to have been in the neighborhood earlier that evening.

Houlihan's Shift Manager Susan Meyers testified regarding the restaurant's timekeeping practices and explained she made handwritten corrections to Mr. Veasy's time card to change the clock-in time to 6:00 PM—Mr. Veasy's scheduled shift. She explained that Houlihan's practice was not to pay employees for any minutes before the start of their scheduled shift. Ms. Meyers also changed the clock-out time by hand to a few minutes earlier than the stamped time because employees would often use the restroom or make a phone call after their shift duties were complete but before they clocked out, and it was not Houlihan's practice to pay employees for time spent doing such personal matters at the end of a shift.

Houlihan's Kitchen Manager Seth Schram also testified. Neither Mr. Schram nor Ms. Meyers had a specific recollection of seeing Mr. Veasy at work on January 24, 1992. Yet, in addition to Meyers's testimony about the timecard (and Houlihan's timekeeping practices), Ms. Meyers and Mr. Schram both testified they could not recall a shift where Mr. Veasy was supposed to work and did not. Mr. Schram also said it would be nearly impossible for someone to clock in without being noticed as absent or to disappear from work for any significant time during a Friday night shift. Further, Ms. Meyers testified she did not know of one instance of timecard fraud during her time at the company.

The prosecution did not refute any of this. Rather, Mr. Gilson attempted to cast doubt on the accuracy of Houlihan's timekeeping practices and insinuated that on a busy Friday night such as the night of the shooting, it would be easy for Mr. Veasy to get another employee to clock in for him.

The jury deliberated for four days before returning its verdict of second-degree murder, thus sparing Mr. Veasy the death penalty.

### Post-Conviction Proceedings

Mr. Veasy appealed, with the appellate courts affirming his conviction in 1994. Notably, in 2001, Denise Mitchell supplied an affidavit saying she had misidentified Mr. Veasy as the shooter. She said she realized this was a strong possibility as far back as the time of Mr. Veasy's trial, if not sooner. The shooter was a guy who resembled Mr. Veasy, whom she knew, but she believed she made a mistake due to her poor vision. Ms. Mitchell explained that she did not come forward sooner with the information because, in her words, "I was confused, poor, and did not know what to do. I was afraid to go to the police or the DA."

Mr. Veasy filed a PCRA petition based on Mitchell's recantation within 60 days of the date of her affidavit, but the petition was rejected as untimely. The court concluded that the date of the affidavit was insufficient proof of when Mr. Veasy learned of

Mitchell's desire to come forward. Because that—and not the date of the affidavit—triggered the 60-day time limit under the PCRA, the court denied his petition.

### New Information – the Shaurn Thomas material

As you are both well aware, the CRU began investigating the innocence claim of Shaurn Thomas last year. In the course of your investigation, the Philadelphia Police Department turned over a file long thought lost containing documents pertaining to the investigation of Domingo Martinez' murder. Within the file were statements from several men—John Lewis, Andrew Bagwell, Lloyd Hicks, and Oliver Walthour—seeming to tie the men to Mr. Martinez' murder. Mr. Hicks was stopped driving in a grey Nova three days following Mr. Martinez' murder in November, 1990, with Oliver Walthour and another man. Walthour spoke with Detective Devlin, telling him that in the afternoon of the day of the murder, Hicks, John Lewis, and Andrew Bagwell went to a bar. Lewis was "flashing around a lot of money" When asked where he got it, he said he had robbed a Puerto Rican man at 7th and Tioga and Sedgley as part of a staged car accident. Walthour also told Devlin that Lewis got his money "going into banks and watching people get money" and then robbing them when he left.

Three days later, Walthour submitted his own "letter of apology" saying he "made up story" so he wouldn't get "locked up." Devlin re-interviewed Walthour in May, 1991, about the Martinez murder. Walthour said he heard that "Shawn" did the murder. He said Shawn was from 7th and Butler, as was his brother T-Bope. T-Bope said the day of the murder, Shawn came home with a lot of money, and talked about robbing someone and killing them. Hicks was interviewed, but provided no helpful information regarding the Martinez murder.

The material provided to me for the Shaurn Thomas case was surprising—not only for the impact on Mr. Thomas' case, but because I recognized the names from my work with Mr. Veasy. Mr. Lewis is the decedent in this case. Bagwell and Hicks were witnesses. At the time of Mr. Veasy's arrest and trial, the Martinez case remained open.

### New Information – the Homicide File material

After his acquittal, Anthony Wright filed suit in the Eastern District Court of Pennsylvania alleging police violated his civil rights in securing a false confession. In addition, he raised a claim extending liability to the City of Philadelphia because the Police Department "had in place a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain confessions," and because the City failed to make any meaningful investigations into the cases. The Complaint lists other individuals who allege Detectives Devlin, Worrell, Santiago, and others violated their constitutional rights in securing evidence in their own cases, notably false confessions. One of the cases cited in Mr. Wright's complaint was Willie Veasy's. (The complaint for the case can be found at Docket number 2:16-cv-05020.)

As part of discovery in the federal civil trial, the City of Philadelphia (in consultation with representatives from the District Attorney's Office and the Philadelphia Police Department) turned over files from the homicide unit of the Police Department for Mr. Wright and the additional named convicted individuals, including Mr. Veasy. Having an interest in Mr. Veasy's case, I asked Mr. Wright's counsel to provide a copy of the file to me, which they did on May 14, 2017. We understand that these materials are not covered by any confidentiality agreement between the parties in the civil case. Although it appears the file is not complete, there were documents contained in the file as part of the investigation of Mr. Lewis' murder which had clearly never been disclosed. We met with Mr. Veasy's trial counsel, Jules Epstein, who confirmed that, to the best of his memory, the information was not provided to him at trial.

### 1.   Statement of Cassandra Hayward

Within the file, we found a statement by **Cassandra Hayward**. Ms. Hayward is identified as Denise Mitchell's step-sister. Ms. Hayward told police she was on the phone with Ms. Mitchell that evening "*when the shooting happened.*" Ms. Hayward told police Ms. Mitchell said she was "outside when it happened and she was almost shot. She saw almost [John's] whole head smashed. She said there were two guys shooting out of the window in the red car and she said someone in a brown and rust car shot the guy in front of her house."

This statement is valuable (and exculpatory) for several reasons: (1) it contradicts Ms. Mitchell's trial testimony she was upstairs in her home when the shooting happened; (2) it is evidence she saw the shooting, despite her denials of that at trial; (3) it is substantive evidence the shooters did not get out of the car, contradicting her trial testimony that Mr. Veasy got out of the car before shooting, and is consistent with other witnesses; (4) that the shooters did not get out negates her ability to make any kind of identification; and (5) it is evidence there were <u>two</u> sets of shooters, directly contradicting the commonwealth's theory of a robbery gone bad as was argued to the jury (which is also supported by the two types of FCCs found at the scene). The statement further supports the notion Ms. Mitchell *did not know who the shooter was*: had the shooter been someone she knew as well as she testified she knew Mr. Veasy, the likelihood is she would have told her sister during a conversation so contemporaneous with the shooting itself.

In addition, Ms. Hayward told police the people in the red car were the "stick up boys" from "across the track around 11th Street."[2]

Ms. Hayward's name was never provided to Mr. Veasy's attorneys. They could not have interviewed her to find out whether she would have testified to those facts at

---

[2] Police seem to have taken this last part seriously enough to run a record for Roland Jackson, who was from 11th Street, and had been arrested for multiple robberies. The search of Mr. Jackson's record was not disclosed to counsel. Even the file we have does not explain why it was done, or what may have been done as a result.

trial. And, of course, the jury never heard from Ms. Hayward as a witness. Indeed, police labeled the statement "non-informative."

### 2. Statement of Efraim Gonzalez

We also found a statement shooting victim **Efraim Gonzalez** gave to police following the shooting. Mr. Gonzalez, who did not testify at the trial, told police he *would be able to identify* the shooter. We do not believe this statement was provided to defense counsel, although he makes mention that Mr. Gonzalez didn't make an identification in his opening statement. It is not clear whether police ever showed Mr. Gonzalez a photo array containing Mr. Veasy's picture.

### 3. Connection of David Simms to the shooting

Trial discovery included a statement from **David Simms** denying any knowledge of the murder. However, there was no reason provided explaining *why* police interviewed Mr. Simms.

According to the Activity Sheets in the homicide file, when police spoke to Denise Mitchell on February 7, 1992 (before they had the name "Willie Veasy"), she told them that "Marshall"—a friend of Mr. Lewis' who lived in the 600 block of Russell Street— knew who committed the shooting. Police found Marshall Wall at 648 Russell Street. Wall told police "David" from 630 W Clearfield St did the shooting. Police took no formal statement from Wall, from what we have seen, but noted the encounter in the Activity Sheet. The police followed up with "David"—David Simms—who denied any knowledge of the crime. Police just asked him a few non-confrontational questions and showed him some photos.

Mr. Simms' statement was provided in discovery, but defense counsel had no idea he had been accused of the shooting by the decedent's friend. They were, obviously, unable to conduct any investigation of the allegation and had no reason to believe Mr. Simms was an important figure in the investigation.

\* \* \*

The jury deliberated for five days before convicting Mr. Veasy of second degree murder. Aside from Ms. Mitchell's identification, the only other evidence the jury had was Mr. Veasy's own "confession"—the contents of which contradicted all of the other witnesses' observations and the physical evidence itself. Those include:

- That the men drove a blue car, when all witnesses said it was red;
- That all 4 men got out of the car, whereas no witness said the same;
- Men on the corner shooting at the car, which no other witness said.

   We are requesting a full, robust review and re-investigation of this case by the
Conviction Integrity Unit. We have exhausted our leads, yet remain convinced of Mr.
Veasy's innocence in this case. I appreciate your attention to this case. I will follow up
next week to set up a time for us to meet to discuss the case in more detail.


                         Sincerely,

                         *Marissa B. Bluestine*

                         Marissa Boyers Bluestine
                         Legal Director


Attachments (Hayward statement; Activity Sheets)

# Exhibit C

On Thu, Jun 15, 2017 at 12:33 PM, Michael R. Miller <Michael.R.Miller@phila.gov> wrote:

Dear Farhang,

The District Attorney's Office believes that someone in your office is disclosing homicide files produced as part of *Monell* discovery to attorneys not involved in this case. In particular, the District Attorney's Office believes Willie Veasy's homicide file has been disclosed to outside attorneys. To the extent that the City has not already done so, we are designating all homicide files other than your client's as confidential in this matter, including documents marked D1125-11329 and all other homicide files that we will be producing to you. Individuals involved in these other cases are entitled to discovery only under applicable provisions of Pennsylvania law. In particular, homicide files in cases where individuals have pending PCRA petitions are confidential under Pennsylvania law, which bars such individuals from receiving their entire homicide file in a PCRA proceeding. Therefore, pursuant to paragraph 8 of the confidentiality agreement, please retrieve homicide files from any individuals and/or law firms or organizations that your office has disclosed them to, and please reply to this email with the identities of any individuals and/or law firms or organizations to whom homicide files were disclosed. If you have any questions about this request, feel free to contact me.

Sincerely,

Michael R. Miller
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch St., 14th Floor
Philadelphia, PA 19102
(215) 683-5433

# Exhibit D

Hi Mike,

I want to let you know that due to the schedules of Mr. Wright's counsel, I will not be able to fully respond to your email by today as I had hoped. I hope to be able to do so by early next week.

Without conceding the appropriateness of Defendants' "confidential" designation or the applicability of any provisions of the Confidentiality Agreement (including paragraph 8), I can represent that until the parties have had a chance to meet-and-confer on this issue, Plaintiff will voluntarily agree not to further share any of the H-files with outside parties. I can also volunteer that, to date, the only outside party we have shared such files with is the one that the DA's Office already knows about -- the Pennsylvania Innocence Project.

In the meantime, I would appreciate if you would provide me with any legal authority you have supporting your "confidential" designation of the H-files produced to us in discovery in this civil action.


Thanks very much,
Farhang


--
Farhang Heydari
Neufeld Scheck & Brustin, LLP
99 Hudson St., 8th Floor | NYC 10013
T: (212) 965-9081 | F: (212) 965-9084
www.nsbcivilrights.com

# Exhibit E

**From:** Farhang Heydari [mailto:farhang@nsbcivilrights.com]
**Sent:** Wednesday, June 21, 2017 5:57 PM
**To:** Michael R. Miller <Michael.R.Miller@Phila.gov>; Bryan Hughes <Bryan.Hughes@Phila.gov>
**Cc:** Anna Benvenu Hoffmann <anna@nsbcivilrights.com>; Peter Neufeld <peter@nsbcivilrights.com>; Paul Messing <pmessing@krlawphila.com>; Amelia Green <amelia@nsbcivilrights.com>; Marissa Boyers Blues ne <mblues ne@temple.edu>
**Subject:** Re: Designa on of Homicide Files as Confiden al

Counsel,

We strongly disagree with your assertion that the H-files provided by the City to Mr. Wright's counsel are covered by the parties' Confidentiality Agreement. On its face, the Agreement contemplates protecting documents containing personal, medical, and financial information -- such as Defendants' personnel files or Mr. Wright's medical records. No doubt this is why the City designated certain documents confidential, but not the H files.

Consistent with the City's designations and the Agreement, Plaintiff's counsel shared certain H-files with Marissa Bluestine, at the Pennsylvania Innocence Project (CCed on this email). Specifically, Plaintiff shared the H-files that Defendants produced for the following cases: Combs, Hernandez, Ogrod, Swainson, and Veasy. We shared these files with Ms. Bluestine via Dropbox and have not shared them with anyone else. Although we do not agree these files are confidential, out of an abundance of caution, we have since disabled the Dropbox link and will not share the files with anyone else.

We also strongly object to your attempt to after-the-fact designate these files as confidential and trigger the claw-back provisions of paragraph 8. Both the terms of the Agreement and the discovery exchanged between the parties make clear that the City's failure to designate these files as confidential was not "inadvertent" as required under this paragraph.

But even more importantly, the claw-back issue presents a number of other problems, particularly in light of the fact that the Pennsylvania Innocence Project has discovered undisclosed *Brady* material in the Veasy file. If it is the City and DA's position is that the Pennsylvania Innocence Project must return these materials and act as if they do not exist, then this issue will certainly require litigation. The Pennsylvania Innocence Project will also surely want (and need) to intervene in any such litigation.

If you will not agree to withdraw your confidentiality designation on all of the H-files (including those yet to be produced), then we suggest a conference call with all of the relevant parties to discuss next steps.

Thank you,
Farhang

# Exhibit F

**From:** Summers, John S. [jss@hangley.com]
**Sent:** Thursday, July 13, 2017 1:57 PM
**To:** Robin Godfrey; 'tracey.kavenaugh@phila.gov'; Bryan Hughes; Michael R. Miller
**Cc:** 'nathan.andrisani@morganlewis.com'; 'kevin.schock@morganlewis.com'; 'jacqueline.gorbey@morganlewis.com'; 'craig.m.cooley@gmail.com'; 'Marissa Boyers Bluestine'
**Subject:** Andrew Swainson [IWOV-HASP1.FID115717]

Robin:
I represent the Project in connection with this matter.
A few things:

1.      Our read of the obligations for the timing of the amended petition is that it should be filed today.  The Project and its co-counsel have obligations to Mr. Swainson and will fulfill them.

2.      The Project did not receive the H-File through any improper disclosure as the City produced the documents and did not designate them as confidential.  *Wright* counsel were therefore fully within their rights to share them with the Project and there was no improper disclosure to the Project.  Please see the Confidentiality Agreement.

3.      There has been no improper circumvention of any discovery proceedings.  The Project obtained the documents from Mr. Wright's counsel long before there was any attempt by the City to designate the documents confidential.  Moreover, contrary to your statement about what took place at the meet and confer – in which Marissa and I were present and you were not – the Project made no agreement about any continued use or dissemination of the documents.

We have repeatedly sought to work this issue through with the DA's Office and City by seeking to have the amended petition filed under seal.  That Judge Robins New did not grant the motion to seal, if anything, reinforces the conclusion that the H-files are not confidential.  Inexplicably, the DA's Office is not cooperating in our efforts to help it preserve confidentiality of the underlying documents that the City contends are confidential by seeking to have the material placed under seal.  Counsel will therefore proceed in the manner in which the Commonwealth is forcing us to move forward – by filing the amended petition, redacting any personal information from the H-files attached.

John


John S. Summers
Hangley Aronchick Segal Pudlin & Schiller
office  215.496.7007
cell    215.421.8951
http://www.hangley.com/team-member/john-summers

# Exhibit G

**From:** Bryan Hughes
**Sent:** Monday, July 17, 2017 12:14 PM
**To:** Summers, John S.; 'Farhang Heydari'; Michael R. Miller
**Cc:** Peter Neufeld; Anna Benvenutti Hoffmann; Amelia Green; Paul Messing; Marissa Boyers Bluestine; Rice, Cary L.; Michael Scalera
**Subject:** RE: Wright - Homicide File Discovery [IWOV-HASP1.FID115717]

Counsel:

To be clear, the position of the District Attorney's Office (DAO) is that Mr. Wright's attorneys should not have disseminated the homicide files to the Innocence Project in the first place.  When my Office discovered that the City had produced these records, which had then been provided by Mr. Wright's attorneys to the Innocence Project, we promptly designated them as confidential under the confidentiality agreement -- which as you may recall was reduced to an Order by Judge Pratter.  My reading of the confidentiality agreement is that it provides for retroactive designations of confidentiality and, upon such designation, it requires the party that disseminated the documents to claw them back pending resolution of the dispute.  As Farhang pointed out in his email on Friday, I requested a claw back during our meet and confer phone call, but opposing counsel would not agree.  I reiterated this position during my phone call with Farhang on Friday, to which he responded that Mr. Wright's counsel would be unable to claw back the documents from the Innocence Project. The DAO's position is that Mr. Wright's attorneys are in violation of the confidentiality order and, to the extent they are unwilling or unable to claw back the documents, then we have no option but to seek to intervene for the purpose of enforcing the order.

During the meet and confer phone call, in the absence of a claw back, we reached an agreement to maintain the "status quo" -- i.e., that the files would not be subject to further dissemination pending resolution of the issue. My understanding of the position of the Innocence Project now is that, although Mr. Summers and Ms. Bluestine were on the call, the "status quo" agreement did not apply to them, but only to Mr. Wright's attorneys. From the DAO's perspective, we find it very hard to believe that anyone participating in that phone call could have walked away thinking the "status quo" agreement did not apply to them.  Why would we ever agree to dissemination by the Innocence Project, so long as there was no dissemination by Plaintiffs' counsel?  Did we need to take a roll call vote to see who was bound?  What makes your position especially disconcerting is that, as we now know, at the time of the meet and confer call the Innocence Project apparently knew that it would be filing a supplemental PCRA petition in the case of Mr. Swainson based on the confidential homicide files received from Mr. Wright's attorneys.  Yet, despite that fact, they remained silent as the other parties on the call agreed to maintain the "status quo."  In short, the DAO's position is that the Innocence Project knew or should have known that it was bound by the "status quo" agreement and that its dissemination of confidential records in the Swainson supplemental PCRA petition was in violation of that agreement.

The issue of whether the homicide files were properly designated as confidential by the DAO is, in my view, secondary to these other issues.  I would be happy to address that secondary issue in a memorandum, as we had previously agreed, but only after the records in question are retrieved from the Innocence Project and we are assured that no copies remain in their possession.  Your requested agreement that the Innocence Project will "agree to not file a PCRA petition based on the Homicide File for the next 10 days, as this dispute is orderly heard and resolved" is insufficient.  Under that agreement, there would be nothing to stop you from continuing to review the confidential material and prepare postconviction petitions based thereon while an unnecessarily protracted meet and confer process plays out.  All the while, the basis of our argument -- that the Innocence Project's very possession of these confidential records amounts to a

highly improper (and orchestrated) end run around federal and state rules governing discovery in postconviction proceedings -- would be subverted. Moreover, there is nothing in your proposal that would prohibit the Innocence Project from further disseminating to other parties. The DAO cannot agree to that.

As many of the people on this email are experienced criminal defense attorneys, well versed in federal and state postconviction practices, I think our fundamental disagreement on the underlying confidentiality designations was fairly clear during the meet and confer phone call on July 5 -- almost two weeks ago. In light of subsequent developments, the DAO is unwilling to wait any longer to seek resolution from the court. Your proposal is not acceptable. Unless there is an agreement to immediate claw back from the Innocence Project by Mr. Wright's attorneys by the close of business today, we will be seeking relief from the court.

Regards,

Bryan Hughes
Chief, Civil Litigation Unit
Philadelphia District Attorney's Office

# Exhibit H

## RE: Andrew Swainson [IWOV-HASP1.FID115717]

**Bryan Hughes**
**Sent:** Thursday, July 13, 2017 5:33 PM
**To:** Summers, John S. [jss@hangley.com]; Robin Godfrey; tracey.kavenaugh@phila.gov; pmessing@krlawphila.com; Michael Scalera
**Cc:** nathan.andrisani@morganlewis.com; kevin.schock@morganlewis.com; jacqueline.gorbey@morganlewis.com; craig.m.cooley@gmail.com; Marissa Boyers Bluestine [mbluestine@temple.edu]

Mr. Summers,

As you are aware, we were both involved in a phone conference on July 5 related to the Anthony Wright litigation. According to my notes, on that call was Michael Scalera, BJ Graham-Rubin, and myself from the DA's Office; Mike Miller from the Solicitor's Office; Farhang Heydari and Paul Messing as representatives of Mr. Wright; and you and Marissa Bluestine for the Innocence Project. We discussed our disagreement regarding the disclosure by Mr. Wright's attorneys of the Homicide files produced during discovery in the civil litigation to the Pennsylvania Innocence Project. I suggested the parties were at an impasse and would need to involve the court in resolving the issues, which as I understand it, is the purpose of your retention on behalf of Mr. Veasy and now Mr. Swainson. You and Mr. Messing recommended that each side put together a memorandum setting forth the reasoning of their respective positions and that we discuss in another phone call thereafter. Those memoranda were to be exchanged tomorrow.

At the conclusion of the call, we all agreed that the "status quo", with respect to the Homicide files, would be maintained pending resolution of the issues. When I inquired as to what the "status quo" meant, it was suggested that it meant that the Homicide files already disseminated would not be shared with anyone else while we continued to try to work out the issues. I objected, arguing that the Homicide files already disseminated should be clawed back, as that was what the confidentiality agreement in the Wright litigation required. When Mr. Miller suggested his opinion to the contrary, I relented on my demand for claw back. Nevertheless, it was my understanding that all had agreed to no further dissemination of the Homicide files while the issues related to the Wright litigation were pending.

Today, I had a meeting with Robin Godfrey during which she indicated that Ms. Bluestine intended to file a supplemental PCRA petition on behalf of Mr. Swainson today based on one of the Homicide files she had obtained from Mr. Wright's attorneys in the civil litigation. After initially consenting to Ms. Bluestine's request that the Swainson PCRA be filed under seal, Robin learned from Ms. Bluestine that the PCRA court, Judge Robbins-New, had advised that she would deny the motion. I advised Robin of my position that the Swainson Homicide file was improperly provided to Ms. Bluestine by Mr. Wright's attorneys in the first place, that the use of that file was an improper attempt to circumvent state and federal postconviction procedures, and that Ms. Bluestine's filing of a supplemental PCRA petition based on Swainson's Homicide file was a violation of the "status quo" agreement reached during the prior phone conference. When Ms. Bluestine then contacted Robin again, asking (apparently) that she move the court for reconsideration of its prior denial of the motion to seal, Robin responded that the supplemental petition should not be filed, that there was no need to file it under the applicable rules and common practices in the Court of Common Pleas, and that we could not agree to approach the court about sealing when it was the very filing of the petition -- not the sealing or nonsealing -- that we objected to.

With respect to the numbered points you raise below, the DAO responds as follows:

1. Swainson's amended petition was not required to be filed today for the reasons explained by Robin in one or more emails with Ms. Bluestine earlier today. Thus, the Innocence Project and its co-counsel were under no obligation to Mr. Swainson to file today, as was represented. To the contrary, your obligation was to maintain the "status quo," as you had agreed to do.

2. We continue to disagree on this point. Our position is that there are rules applicable in state PCRA and federal habeas cases that set forth the process by which discovery may be obtained. It was improper, under the confidentiality agreement and otherwise, for Wright's attorneys to disseminate the Homicide files to the Innocence Project.

3. The filing of two PCRA petitions -- for Mr. Veasy and Mr. Swainson -- based on improperly obtained documents is clear circumvention of both state and federal discovery proceedings. In one of those cases, in fact, a motion for the very same Homicide file was pending before the court at the time the Innocence Project obtained it from Mr. Wright's attorneys (and before Ms. Bluestine had entered an appearance in the Swainson PCRA, I might add). To the extent you indicate that "the Project made no agreement about any continued use or dissemination of the documents," we are in disagreement, and the recollection of at least one of the other attorneys from my office involved with the call is the same as mine (I haven't yet spoken with the other).

Please be advised that, in light of today's events, the Office intends to file this evening a motion to intervene in the Wright litigation.  As such, we will not be providing the anticipated memorandum tomorrow.

Regards,

Bryan Hughes
Chief, Civil Litigation Unit
Philadelphia District Attorney's Office

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY WRIGHT,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 16-5020** |
| **CITY OF PHILADELPHIA,** *et al.*, | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2017, upon consideration of intervenor the Philadelphia District Attorney's Office's motion to enforce confidentiality order, and all papers submitted in support and in opposition, it is hereby ORDERED as follows:

1. The District Attorney's Office's motion is GRANTED;

2. Counsel for Plaintiff Anthony Wright is hereby ENJOINED from further dissemination of any files designated as confidential pursuant to the Court's March 1, 2017 confidentiality order (ECF No. 44); and

3. Counsel for Plaintiff is ORDERED to retrieve all files designated as "confidential" that have been provided to individuals who are not authorized to view them under paragraph three of the Court's March 1, 2017 confidentiality order.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of July, 2017, I served the foregoing on all counsel of record via filing on the Court's ECF system.

 */s/ Michael Scalera*
Michael Scalera
Assistant District Attorney