IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY WRIGHT, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 16-5020 |
| CITY OF PHILADELPHIA et al., | : | |
| *Defendants*. | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                                             NOVEMBER 20, 2017

**I.    Background**

Anthony Wright sued the City of Philadelphia and several former police officers for alleged constitutional violations arising out of his 1991 arrest, 1993 prosecution, and 25-year imprisonment for a rape and murder he did not commit. In 2016, a jury acquitted Mr. Wright of the rape and murder after a retrial that included DNA evidence not available at his initial trial.

In December 2016, during discovery for this civil case, Mr. Wright requested files from other homicide cases in which the same defendants had been accused of misconduct (the "homicide files"). On March 1, 2017, the parties docketed their Confidentiality Agreement for this case. The next day, after assistance from the District Attorney's Office, the defendants produced several of the requested homicide files. None was designated confidential.

In May, Mr. Wright showed the homicide files to representatives of the Pennsylvania Innocence Project. Innocence Project attorneys had previously worked on those homicide cases, and Mr. Wright's lawyers sought their help to understand whether the files contained *Brady* information that was never turned over.

1

On June 13, Innocence Project lawyers concluded that some of the files contained exculpatory evidence pertinent to the cases documented in the homicide files and filed state Post Conviction Relief Act (PCRA) petitions to overturn convictions for those homicide defendants. Two days later, the defendants in this case retroactively designated the homicide files "confidential" under the Confidentiality Agreement.

This discovery dispute ensued. The defendants and District Attorney's Office (as an intervenor) filed a Motion to Enforce the confidentiality designation, which this Court denied on August 23. *Wright v. City of Philadelphia*, No. 16-5020, 2017 WL 3620059 (E.D. Pa. Aug. 23, 2017). Meanwhile, Mr. Wright and the Innocence Project (as an intervenor) have filed Motions to Strike the confidentiality designation. The Court held oral argument those motions on October 2. The Court now grants Mr. Wright's motion and moots the Innocence Project's motion.

## II. Standard of Review and Allocation of Burden

According to the parties' Confidentiality Agreement, the defendants bear the burden of showing why the homicide files are confidential. *Cf. Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786–87 (3d Cir. 1994) (burden of justifying confidentiality is on party seeking confidentiality order).

## III. Discussion

Mr. Wright and the Innocence Project have briefed three main arguments for why the homicide files should or should not be confidential:

  A. The defendants and the District Attorney's Office waived their claims of confidentiality.
  B. The homicide files must be "personal" to be confidential.
  C. The homicide files do not satisfy the *Pansy* balancing test for confidentiality.

2

In addition, the defendants and the District Attorney's Office now argue that the motions of both Mr. Wright and the Innocence Project are moot, given that the Court has denied the Defendants' Motion to Enforce. The Court will take each issue in turn.[1]

## A. *The defendants and the District Attorney's Office did not waive their claims of confidentiality.*

In pertinent part, the Confidentiality Agreement provides:

> If a party . . . inadvertently produces or discloses confidential information, . . . without marking it "Confidential" . . . the producing party or the DAO may subsequently designate the document or information as "Confidential" . . . .

Mr. Wright argues that the defendants waived their right to designate the homicide files as confidential. He points out that in February, the defendants said they would turn over the files; in March, they did so; and only in June, after the Innocence Project filed its PCRA petitions, did they claim confidentiality. By waiting three months to assert confidentiality, Mr. Wright argues, the defendants waived their rights to designate the homicide files as confidential.

The defendants and the District Attorney's Office (as an intervenor) counter with the text of the parties' Confidentiality Agreement. In the paragraph reproduced above, the agreement provides that a party that "inadvertently produces or discloses confidential information . . . without marking it 'Confidential'" can still "subsequently designate the document or information as 'Confidential.'" The District Attorney's Office argues that it would make little sense for the

---

[1] The parties also briefed the question whether the defendants' failure to assert confidentiality in March was "inadvertent" enough to qualify for retroactive designation. In light of the Court's opinion in August, however, counsel for Mr. Wright conceded at oral argument that this argument was no longer relevant. *See Wright*, 2017 WL 3620059, at *3 n.4 ("Mr. Wright disputes that he and his counsel were even under this obligation [to use reasonable efforts to retrieve the documents] because Defendants produced the Homicide Files purposefully, not inadvertently. . . . The plain language of the Confidentiality Agreement contemplates the inadvertent failure to designate as confidential documents produced purposefully.").

3

agreement to provide for retroactive designations of confidentiality, "so long as they are not *three months* after the fact." DAO Resp. to Pltf's Mot. Strike, at 2.

The Court agrees with the District Attorney's Office. If it were possible to waive confidentiality by not asserting it at the outset, why would the Confidentiality Agreement include a way to retroactively designate confidentiality? Mr. Wright's definition of waiver would render the retroactive-designation paragraph superfluous.

### B. *The homicide files do not need to be "personal" to be confidential.*

In pertinent part, the Confidentiality Agreement provides:

> [T]he undersigned counsel . . . hereby consent and agree to the following Agreement . . . to protect from unauthorized disclosure, publication, and use information of a kind whose confidentiality is properly protected under Rule 26(c) of the Federal Rules of Civil Procedure.
>
> . . . In particular, (1) the personnel files and personal information of the individual defendants in this action and (2) the medical, personal, and financial information of Plaintiff shall be deemed confidential. Additionally, any social security numbers contained in any documents shall be deemed per se confidential. . . .

Mr. Wright argues that section 2 of the Confidentiality Agreement, reproduced above, demonstrates that only personal information may be designated confidential. Because the homicide files are not personal information, he reasons, they cannot be confidential.

The District Attorney's Office counters that Mr. Wright's reading of the agreement is too selective. Personnel files and personal, medical, and financial information are merely examples of confidential information. The agreement uses the words "in particular" to show that personal, medical, and financial records are just the clearest cases of confidential information. The agreement protects much more; the recitals at the beginning of the document explain that the

agreement protects "information of a kind whose confidentiality is property protected under Rule 26(c) of the Federal Rules of Civil Procedure." This is a much broader swath of information.

The District Attorney's Office is correct that personnel files and medical, personal, and financial information comprise a non-exhaustive list of confidential information. Under Rule 26(c), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." This is both a broader and a more restrictive category than simply "personal" information; information need not be personal to be confidential, and not all personal information is confidential.

Thus, the fact that the homicide files are not "personal" does not close the case. Instead, it just bumps the analysis to the *Pansy* "good cause" factors.[2]

### C. The homicide files do not satisfy the **Pansy** *balancing test for confidentiality.*

In *Pansy v. Borough of Stroudsburg*, the Third Circuit Court of Appeals announced a multifactor balancing test to determine whether "good cause" exists to justify a confidentiality order. 23 F.3d 772, 786 (3d Cir. 1994). The party seeking confidentiality must show that the disclosure would inflict a clearly defined, serious injury, and must satisfy a balancing test that includes at least seven factors.

The Court first takes up the question whether the defendants have demonstrated a clearly defined and serious injury, before addressing the balancing test. Finally, the Court addresses the District Attorney's Office's argument that criminal files are *per se* confidential.

1. Clearly Defined and Serious Injury

Good cause is established by showing that "disclosure will work a clearly defined and serious injury to the party seeking closure." *Pansy*, 23 F.3d at 786.

---

[2] At oral argument, counsel for Mr. Wright indicated that the non-personal nature of the files in question is relevant to the *Pansy* analysis — presumably, to the question whether disclosure would violate privacy interests.

5

The defendants and the District Attorney's Office argue that disclosing the homicide files will allow groups like the Innocence Project to circumvent the strict discovery rules in the Pennsylvania Post Conviction Relief Act. They argue that this end-run usurps the Commonwealth's "right to determine its own procedures for postconviction review." DAO Resp. to Pltf's Mot. Strike, at 5.[3]

Indeed, the Innocence Project has already used the files to this effect. The District Attorney's Office alleges that the Innocence Project used the homicide files to work around two PCRA court decisions denying discovery. The District Attorney's Office argues that tactics like these, enabled by defendants' initial failure to designate the files as confidential, offend federal/state comity.[4]

Mr. Wright sees the case differently. In his view, the District Attorney's Office's so-called "injury" is that "convicted defendants may obtain and use information from the files to demonstrate constitutional violations and vacate their convictions." Pltf's Reply, at 3. Mr. Wright argues that respecting constitutional rights is in the Commonwealth's interest.

In the Court's view, although the state post-conviction discovery rules are restrictive, this is a federal § 1983 case following federal discovery rules. State law does not dictate § 1983

---

[3] The PCRA is just the tip of the iceberg. The District Attorney's Office cites several other state statutes that would ordinarily keep these files out of the hands of not only the Innocence Project, but also Mr. Wright. Among these statutes are the Pennsylvania Right-to-Know Law, 65 Pa. Cons. Stat. § 67.708(b)(16); the Criminal History Record Information Act, 18 Pa. Cons. Stat. § 9106(c)(4); and Pa. R. Crim. P. 902(E)(1).

[4] In a sort of Catch-22, the only reason Mr. Wright needs to show the files to the Innocence Project is to build his *Monell* claim regarding undisclosed *Brady* information. In other words, the Innocence Project is only helpful to Mr. Wright if the Innocence Project's clients' *Brady* rights were violated. But discovering those very *Brady* violations will immediately prompt the Innocence Project to challenge its clients' underlying convictions — the exact harm that the District Attorney's Office argues should justify the confidentiality designation.

discovery. *See* U.S. CONST. art. VI, cl. 2. Therefore, the defendants and the District Attorney's Office have not articulated a clearly defined and serious injury.

2. Balancing Test

According to *Pansy*, the party seeking confidentiality must satisfy a balancing test that includes the following factors:

i. Will disclosure violate privacy interests?
ii. Is the information sought for a legitimate purpose?
iii. Will disclosure embarrass a party?
iv. Is the information important to public health and safety?
v. Will sharing the information promote fairness and efficiency?
vi. Is the party benefitting from confidentiality a public entity or official?
vii. Does the case involve issues important to the public?

This section analyzes each factor.

*i. Will disclosure violate privacy interests?*

The first factor in the *Pansy* confidentiality balancing test is the effect on privacy interests. According to the Innocence Project, its clients will waive their privacy interests in their homicide files, and the Innocence Project would redact other private information like social security numbers. The District Attorney's Office contends that the files contain private information about witnesses and confidential informants.

This factor favors striking the confidentiality designation. Police officers do not have a privacy interest in how they do their jobs. To the contrary, there is a strong public interest in shining a light on police misconduct. To the extent that the files contain information about witnesses and confidential informants, the District Attorney's Office can redact those identifying portions of the files. For the time being, however, the District Attorney's Office cannot claim blanket confidentiality over all the files by asserting a nebulous privacy interest.

> ii. *Is the information sought for a legitimate purpose?*

Mr. Wright's legitimate purpose for striking the confidentiality designation is to seek assistance in proving his case. To pursue his *Monell* claim against the City, Mr. Wright needs to show a pattern of police misconduct. He cannot identify instances of *Brady* violations in the homicide files without the help of the Innocence Project's lawyers who defended those cases and better know their contexts. Only the Innocence Project's lawyers, who "spent years learning the details of these cases," can spot *Brady* violations and enable Mr. Wright to pursue his *Monell* claim. Pltf's Mot. Strike, at 4.

The defendants dispute that showing the homicide files to the Innocence Project is the *only* way Mr. Wright can make out his *Monell* claim. Instead, they argue that Mr. Wright could ask the Innocence Project lawyers for a list of exculpatory evidence that was disclosed in the homicide cases, and then cross-reference that list against the contents of the files to see if any exculpatory evidence was not disclosed.

In addition, the District Attorney's Office trots out a parade of discovery-based horribles that it argues would follow from lifting confidentiality here. It predicts that an order lifting confidentiality would lead to "repeated discovery fights" in § 1983 cases in which "*Monell* plaintiffs seek criminal files from the city." DAO Resp. to Pltf's Mot. Strike, at 5. Those discovery spats would play out in federal court, not in the Court of Common Pleas where they belong.

For its part, the Innocence Project claims a separate legitimate purpose for disclosure. The Innocence Project's purpose is to advance its clients' *Brady* rights. And the defendants (and District Attorney's Office) have no legitimate purpose in preventing that access. In fact, they have an ongoing obligation to make *Brady* material available.

8

The District Attorney's Office objects that the Innocence Project's claimed purpose — advancing its clients' interests — is not germane to this factor, which is about *Mr. Wright*'s purpose for disclosure. And, as explained above, the District Attorney's Office believes that the Innocence Project's purpose amounts to little more than circumventing the PCRA discovery rules.

In the Court's view, the Innocence Project's purpose is not legitimate in this context. Presumably, the Innocence Project is interested in *lots* of confidential information held by police departments. That alone should not justify disclosure.

Mr. Wright's purpose, however, is legitimate. His lawyers state that they need help deciphering the homicide files. The defendants' suggestion — that Mr. Wright cross-reference the homicide files with a list of exculpatory evidence provided by the Innocence Project — is unfair for two reasons. First, even with an Innocence Project-provided list, Mr. Wright may not tell which evidence in the homicide files is *new* exculpatory evidence. Second, this cumbersome process would tilt the playing field; Mr. Wright would be analyzing the files on his own, while the defendants would benefit from a free back-and-forth with the District Attorney's Office over the files. Analyzing the files on his own would put Mr. Wright at a profound disadvantage; as his attorney pointed out at oral argument, one must have "lived" the files to truly understand them. *Cf.* OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881) ("The life of the law has not been logic: it has been experience."). Viewed realistically, the defense's suggestion smacks of the disingenuous tactic of "dump truck discovery," whereby mountains of useless paper was dumped on the opponent's doorstep with the invitation to "have at it" to find the proverbial needle amid the haystack. Such an invitation does no credit to the offeror.

### iii. Will disclosure embarrass a party?

The defendants have identified no embarrassment that would flow from disclosure. This factor therefore favors Mr. Wright.

### iv. Is the information important to public health and safety?

Confidentiality is disfavored when information is "important to public health and safety." *Pansy*, 23 F.3d at 787 (citing Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 HARV. L. REV. 427, 278 (1991)). The District Attorney's Office argues that lifting confidentiality over the homicide files might enable "guilty" prisoners to secure release. DAO's Omnibus Surreply, at 5. This is nonsensical; it is unclear how homicide files containing evidence of police misconduct could lead to "guilty" prisoners being released. The argument suggests a disavowed law enforcement policy of "whatever works." To the contrary, information about potential police misconduct is important to public safety. This factor favors Mr. Wright.

### v. Will sharing the information promote fairness and efficiency?

As explained under the "legitimate purpose" factor, above, the confidentiality order hampers Mr. Wright's "ability to investigate and develop his *Monell* claims." Without the help of the Innocence Project, Mr. Wright cannot reliably tell whether the homicide files contain new exculpatory evidence. The defendants, on the other hand, "can consult with the District Attorney's Office — which has complete access to each of the homicide files — to develop their defenses." Pltf's Reply, at 3–4. That mismatch is unfair. This factor therefore favors Mr. Wright.

    *vi.* *Is the party benefitting from confidentiality a public entity or official?*

Because the defendants are a public entity and public officials, this factor also favors Mr. Wright.

    *vii.* *Does the case involve issues important to the public?*

For the same reasons that public scrutiny of police tactics is important for public safety, it is important to the public in general. This factor favors Mr. Wright.

   3. <u>Criminal files are not per se confidential.</u>

Setting aside the specifics of the *Pansy* test, but remaining under the rubric of *Pansy*, the District Attorney's Office argues that courts "routinely" issue protective orders over criminal files. It cites one case, *Wong v. Thomas*, 238 F.R.D. 548 (D.N.J. 2007), for this proposition.

In *Wong*, a state employee in New Jersey sued her state employer for wrongful termination. The employer claimed that the employee was fired for misappropriating state funds and had been under criminal investigation. In discovery, the employee sought files from her state criminal investigation, which prosecutors had closed without bringing any charges.

The court granted the employee access to the files, but held that the files were confidential. The court concluded that the state "cannot demonstrate good cause to prevent the file's disclosure" under Rule 26(c), but it went on to hold that, "because the file sought by Plaintiff is a criminal investigation file, there may exist significant reasons not to disclose the information beyond the present litigation." *Id.* at 553. The court did not explain what those "significant reasons" might be.

In the Court's view, *Wong* is too slender a reed to support the contention that criminal files are routinely deemed confidential. This is especially true when the files sought by Mr. Wright are over two decades old and the Innocence Project's clients (the defendants in the files) have waived their privacy interests in the files.

In essence, by relying on *Wong* to assert that homicide files are *per se* confidential, the District Attorney's Office is simply seeking to flip its burden of proof onto Mr. Wright. At oral argument, counsel for the District Attorney's Office admitted that he had not been through all the files and could not even identify a single confidential informant. Indeed, the District Attorney's Office has yet to point to a specific confidential fact or passage in any file.

Each side compares the other's silence (or near-silence) on case law to Arthur Conan Doyle's famous dog that did not bark. *Compare* Innocence Project's Reply, at 4 ("[J]ust as Sherlock Holmes made an important inference from the fact that a dog did not bark at night, so the Court should conclude that the District Attorney's Office's and Defendants' silence on legal authority is telling."), *with* District Attorney's Office's Omnibus Surreply, at 3 & 3 n.2 (arguing that the true "dog that did not bark" is Mr. Wright's lack of case authority applying *Pansy* to homicide files). But the real muzzled mutt in this case is the fact that the District Attorney's Office has not pointed to a single, specific piece of confidential information in any of the homicide files.

Going forward, the District Attorney's Office is free to designate particular pages or passages in the homicide files as confidential. But the District Attorney's Office cannot assert a blanket claim of confidentiality over 10,000 pages of documents. The Court is not bound to defer to the District Attorney's Office's bald assertion that every page of every homicide file is confidential. *Cf.* Anna Lvovksy, *The Judicial Presumption of Police Expertise*, 130 HARV. L. REV. 1995 (2017) (criticizing courts' growing tendency over the course of the twentieth century to defer to the insights of law enforcement as to a wide range of criminal matters).

*D. Mootness*

On August 23, the Court issued an opinion denying the defendants and District Attorney's Office's Motion to Enforce the confidentiality designation. *See Wright*, 2017 WL 3620059. In light of the opinion, the District Attorney's Office argues that the motions of both the Innocence Project and Mr. Wright are moot.

For ease of reference, the pertinent passages from the Court's August 23 opinion are reproduced below:

> "The DAO ultimately seeks to prevent what has already been done. Criminal defendants represented by the Innocence Project obtained discovery concerning their respective criminal cases through the civil discovery process in this § 1983 action. The Innocence Project has since used that discovery to file or amend Pennsylvania Post-Conviction Relief Act ("PCRA") petitions on behalf of its clients." *Id.* at *2.
>
> "[T]here is virtually no amount of effort (at least within the boundaries of the law) that a party can take to force a nonparty — under no legal or ethical obligations of its own — to return documents it refuses to return." *Id.* at *4.
>
> "Because the Innocence Project is not a party to this litigation, and thus *not bound by the provisions of the Confidentiality Agreement*, it is not clear to the Court how the DAO proposes to compel the Innocence Project to return the Homicide Files." *Id.* at *4 (emphasis added).

1. The Innocence Project's motion is moot.

The District Attorney's Office argues that the cat is already out of the bag, at least with respect to the homicide files and the Innocence Project. The Court has concluded that the Innocence Project cannot be compelled to return the files and is not bound by any designations under the Confidentiality Agreement. This means that "a decision granting or denying the [Innocence Project's] motion to strike would neither justify the retention of the homicide files nor secure their return." DAO's Resp. to IP's Mot. Strike, at 1. In other words, the correctness

of the confidentiality designation "has no bearing" on the Innocence Project's "rights and responsibilities," so the Innocence Project's Motion to Strike is moot. *Id.* at 2.

The Innocence Project insists that it still has two interests in the outcome of its motion. First, if the files are deemed confidential, then communication between Mr. Wright and the Innocence Project would shut down. This would inhibit Mr. Wright's ability to assess the relevance of the files to his *Monell* claim. Second, since this dispute started, the defendants have produced additional homicide files to Mr. Wright. The Innocence Project has an interest in inspecting those files for *Brady* violations.

The Court finds that the Innocence Project's motion is moot. Now that the Innocence Project is definitively not bound by the Confidentiality Agreement, the only interest it can assert is an interest in helping Mr. Wright. But getting assistance for a *Monell* claim is the gravamen of *Mr. Wright's* motion, not the Innocence Project's.

> 2. <u>Mr. Wright's motion is not moot.</u>

In a single footnote in its first brief arguing for mootness, the District Attorney's Office asserts that "[t]he reasoning supporting mootness [of the Innocence Project's motion] appl[ies] with equal force to Plaintiff's motion to strike." DAO's Resp. to IP's Mot. Strike, at 2 n.2.

The Court disagrees; Mr. Wright's motion is not moot. As Mr. Wright explains, the confidentiality designation "continues to prejudice [Mr. Wright] by hampering his ability to develop and investigate his *Monell* claims." Pltf's Surreply, at 2. His lawyers maintain that they need the Innocence Project's help to understand the details of the homicide files. In addition, some of the homicide files are about cases that the Innocence Project never worked on. Unless confidentiality is lifted, Mr. Wright "will be hamstrung in his ability to consult with counsel for those defendants not represented by [the Innocence Project]." *Id.*

14

In its latest filing, the District Attorney's Office argues that Mr. Wright is seeking to move the goalposts; originally, Mr. Wright moved to strike the confidentiality designations over the *retroactively* designated files, but now he seeks to strike the designations over *all* confidential homicide files. Discovery in this case is ongoing, and to the extent that the District Attorney's Office is turning over new, confidentially designated homicide files, the Court will construe Mr. Wright's motion as covering those files as well.

## IV. Conclusion

For the foregoing reasons, Mr. Wright's Motion to Strike is granted and the Pennsylvania Innocence Project's Motion to Strike is deemed moot. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE